**In the Interest of E. S. M.**

**No. 16812.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

April 21, 1977.

Rehearing Denied May 19, 1977.

Martin J. Grimm, Houston, for appellant.

Bray & Watson, Robert V. Holland, Jr., Houston, for appellee; W. B. Irwin, Jr., Houston, of counsel.

PEDEN, Justice.

Wendy Golden appeals from a decree terminating her parental rights in favor of the petitioners, Lydia and William Baxter. Appellant contends that later decrees entered in this case ineffectively attempted to correct judicial errors and that the termination was unsupported by any evidence or was contrary to the great weight of the evidence.

Mr. and Mrs. Baxter, the appellees, brought this suit to terminate the parental rights of the appellant and of Lawrence Hue McClain to E.S.M., the child in question, so they could adopt him. By the time of the hearing they had kept him at the mother's request for more than two years. The trial judge announced his decision of termination of parental rights after a trial on the merits and appointed the appellees as managing conservators of the child. The written judgment subsequently entered, however, mistakenly decreed that "the parent-child relationship between Lawrence Hue McClain and Wendy Celeste Golden, a/k/a Angelina McClain be and is hereby terminated . . . ." It also failed to recite that the defendant-appellant had been cited and had appeared. The appellant asserts that these two errors made the judgment invalid. We hold that the omission of a recital that the defendant had been cited and had appeared did not constitute error. It is clear that she did appear and participate fully in the hearing. The appellees filed a motion to enter a judgment nunc pro tunc reciting that the parent-child relationship between Lawrence Hue McClain and the appellant as parents and E.S.M., the child, was terminated; the trial court granted this motion on May 17, 1976, and the appellant perfected this appeal from that date under Rule 306b, Texas Rules of Civil Procedure. That purported nunc pro tunc decree was defective, however, because it contained no indication that it was being entered nunc pro tunc or that

the first judgment was being vacated, reformed, corrected, or amended. See *City of West Lake Hills v. State ex rel City of Austin*, 466 S.W.2d 722 at p. 726 (Tex.1971). A third decree has been signed while this case was on appeal; it contains recitals that the previous two judgments are vacated, and it corrects the errors noted in the first one. We base our review of this case on the third decree.

■ The appellant contests the validity of the original termination decree and the subsequent decrees in her first and second points of error. She also complains that the judgment was based on unverified pleadings, citing Tex.Fam.Code § 11.08(b). We hold that she waived this defect by not pointing it out by special exception or by filing a plea in abatement. *Hays v. Old*, 385 S.W.2d 464, 465 (Tex.Civ.App.1964, writ ref. n. r. e.); Rule 90, T.R.C.P.

Appellant argues that the mistakes in the original judgment constituted judicial errors, so they could not be corrected by a nunc pro tunc judgment entered more than 30 days after the entry of the original judgment.

■■ A judicial error is one made in the rendition of the judgment, whereby an improper judgment is rendered; a clerical error occurs where the minutes of the court do not correctly recite the judgment actually rendered. A clerical error may be corrected at a subsequent term of court. *Love v. State Bank & Trust Co.*, 126 Tex. 591, 90 S.W.2d 819 (1936); *Coleman v. Zapp*, 105 Tex. 491, 151 S.W. 1040 (1912). When the rendition of judgment is valid, the court has the power to correct any mistake or omission in the record of the judgment by entering a judgment nunc pro tunc. Rules 316 and 317, T.R.C.P.; Reavley & Orr, Trial Court's Power To Amend Its Judgments, 25 Baylor L.Rev. 191, 194 (1973).

■ In our case the trial judge rendered judgment at the close of the termination hearing when he said: "The parent-child relationship is terminated. The Petitioners are appointed managing conservators of the child." The failure of the original decree to correctly recite this was simply a clerical error made in the entry of the decree on the minutes of the court. It is clear that the parent-child relationship was terminated by the court's oral rendition at the end of the trial. We overrule the appellant's first two points of error.

■■ In her third and fourth points the appellant complains that the trial court erred in terminating her parent-child relationship with E.S.M. because there is no evidence and insufficient evidence to sustain the trial court's findings in support of the order. These points are multifarious, but we will consider them. In deciding no evidence points, we view the evidence in a light most favorable to support the trial court's findings. *Fisher Constr. Co. v. Riggs*, 160 Tex. 23, 325 S.W.2d 126 (1959). Great weight points require a consideration of all the evidence.

The trial court made findings (under the numbers shown) that the appellant and the child's father had:

5. voluntarily left the child alone or in the possession of another, not the parent, without expressing an intent to return.

6. voluntarily left the child alone or in possession of another not the parent without expressing an intent to return, without providing for adequate support of the child and remained away for a period of at least three months.

7. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.

8. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

9. failed to support the child in accordance with their ability during a period of at least one year.

10. and that the termination would be in the best interest of the child.

Findings 7, 8, and 10 correspond with provisions (1) D, E, and (2), respectively, of the involuntary termination statute of the Texas Family Code, § 15.02 (1974). We review all of the evidence pertaining to these findings.

The termination hearing began on July 31, 1975. The first witness was the appellant, Wendy Golden, age 24. She is also known as Wendy Doherty and Angelina McClain. She identified Lawrence Hue McClain as father of her child, E.S.M. She describes her relationship with McClain as a common law marriage but says she also had a previous common law marriage to Henry Golden and has never been divorced. She has lived alone for the past four months after having lived with one Thomas Cox. Before that she was in the county jail for three months on a charge of criminal trespassing in a store; the charge was burglary, but she pleaded guilty to the reduced charge of trespassing. She has also been in jail twice for prostitution, once for carrying a pistol, once for theft, once for possession of marijuana, and once for possession of narcotics paraphernalia. Before her last jail sentence she lived a couple of places with Thomas Cox, and before that she was in jail for two months on the theft charge. She thinks she has been in jail seven to ten times. The child in question, E.S.M., was born on November 18, 1972. In that year she lived in the Kingston Apartments with Lawrence McClain. She doesn't recall that anyone else lived with them, but Johnny Price stayed there occasionally. When E.S.M. was born he lived there, as did a dog and a cat.

She voluntarily allowed Mr. and Mrs. Baxter to take E.S.M. because she was going to jail on one case and had other charges against her. She is now in sales work for Super Pretzel of Texas. She says she has worked sporadically as a prostitute and was doing so before her son's birth. She can give no estimate as to the number of times she has worked as a prostitute, and does not know whether it was more than 50. She can't explain how the child has blue eyes and blond hair when McClain is black.

She has had two children besides E.S.M. Both of them died in their cradles within 48 hours after birth.

She has used amphetamines, L.S.D., marijuana, and has tried heroin. She said she believed the term "supercharging" meant the inhaling of marijuana smoke, then blowing it into the face of another. This testimony was elicited from her:

"Q Have you ever supercharged your son when you had him, seven months or younger, to put him to sleep so that he would stop crying?

A Possibly. I mean, he was in a room full of smoke, and I did smoke marijuana, yes.

Q Smoked marijuana almost continuously when you had him in your possession, did you not?

A Yes, sir, I did.

Q And used other drugs almost continuously while you had your son in your possession, did you not?

A Yes, sir, I did. I told the reasons why I gave him up at the time because I could not handle him.

Q Well, didn't you just previously testify that one of the reasons that you gave him up, or at least implied one of the reasons you gave up was because you were afraid of his welfare?

A Yes, sir. That is another reason. There are many reasons that I was afraid for him. There are many reasons why his birth certificate is not in my real name. There are many reasons why he was placed out of town, not with dope fiends and not with any people that I was around, so that he would not end up with the welfare. I thought that I placed him in good hands with an oral agreement that once all of my cases, and all of my problems, should they be drugs, should they be illegal, until I was stable enough to take my son back, which I am now, that then I could come back and get him. That was the oral agreement.

> Q When was the last time that you were at the Baxters' home and visited with the child?
>
> A Approximately, two weeks ago.
>
> Q Had you been using any drugs before you arrived?
>
> A I believe I had smoked some marijuana, one joint of marijuana, before I arrived.
>
> Q Just previous to arriving and visiting with your son?
>
> A Yes, sir."

She placed E.S.M. with the Baxters when he was six or seven months old. In the two years he has been with them she has visited with him very few times—about five. Since he has been with the Baxters he has never appeared mistreated. He is well fed and appears to be receiving all the love and affection of any normal home. She once tried to give him a $100 bill, but the Baxters told her she could not do so. She explained that her never having given him any Christmas or birthday presents was because she was in jail on both those occasions. She knows how to take care of a child; "I think any mother knows." She denied having let her child become so dirty that others had to change him. She admitted that she never actually provided the Baxters with any money for support of her child in the two years he had been with them. She offered money on one occasion —"Yes, only when I could afford it."

She said when she had her son with her she placed him in the best conditions she could afford, but she admitted that she was not required to give him conditions under which she and her visitors were continuously using different kinds of dope. She also admitted that she didn't think those conditions were conducive to the best interests of a child six months old.

She placed her son with the Baxters because McClain was with the Bandidos, there was a battle between bike clubs, and a contract "had been pulled on me;" McClain had almost been shot a few times, Heather, her babysitter, had her face eaten up with acid as a part of the battle between the bike clubs, and the appellant's apartment had been shot up. Further, she had some charges pending against her, and she saw no way she could fairly take care of her child. She searched and found the Baxters to take care of him properly. She says her life is now straightened out except for not having her son. Her life was changed by an incident that occurred while she was in jail. She had someone call the Baxters to explain why she couldn't visit her son on his birthday and to say that when she got out she could begin to readjust to society, but they sent a lawyer to ask her to give him up. When she got out she tried to start making her life right.

She doesn't believe her son recognized her when she walked into the courtroom. She said she doesn't use or need drugs now but admitted having smoked marijuana before visiting her child two weeks ago. Her explanation of this inconsistency was that when the word "drugs" is used, she thinks of hard drugs. She now makes about $200 per week in commission from Super Pretzel of Texas. She said she has cirrhosis of the liver and is on the verge of having liver cancer.

We review the testimony of Mr. Baxter. He lives with his wife and E.S.M. in Richmond, Texas. E.S.M. has his own bedroom, a playroom, a rabbit, and a pony. Baxter has two jobs but is always at home by 5 P.M. His wife does not work outside their home. E.S.M. came with them on June 20, 1973. He has neighborhood children to play with. Baxter and his wife love the child and want to adopt him. He has learned to crawl, walk, and talk while living with them. They do not drink or use drugs. Baxter has seen the appellant visit only three times in the 26 months E.S.M. has been with them. E.S.M. seemed afraid of McClain. When E.S.M. came to them he seemed to be afraid of black people, of policemen, and of sirens.

Mrs. Baxter testified that when the appellant came to visit E.S.M. on Thanksgiving something was wrong with her. She said she would have the baby back by 3 P.M., but didn't call until 7:30 P.M. Mrs. Baxter went into town to meet them, and

when she took the baby she could smell beer. One of the boys told the appellant she shouldn't have picked the baby up in that shape, and she replied that she wanted to see him and "just had to do this." She had on such a tiny costume that you could see everything. Mrs. Baxter had called her many times to come spend weekends, but she refused, saying that she didn't have time because weekends were her busiest time. "And I just kept calling her and asking her, and she would never come." She gave them no money to support the child.

Mrs. Baxter described one apartment where E.S.M. had lived with the appellant. It had one big room with a kitchen adjoining it. There were no beds, just mattresses on the floor in each corner. The baby slept in a small playpen with one small cloth blanket. There was a dog and three cats, and the place was "run over with dirt." E.S.M. lived there with the appellant and with McClain, Price, and another boy.

When asked whether the appellant ever paid or offered any money, Mrs. Baxter replied:

A. No, sir. We didn't ask her. She never offered. No, sir. I wasn't hired as a babysitter. She wanted to place him in my home because she said she couldn't make a home, you know, for him or be a real mother to him. She wanted someone to have him to take good care of him and that she would maybe someday be back to take him as her own baby, but she wasn't sure. And she kept not wanting to come over, she said she would rather stay away because it was upsetting to the baby, that he didn't know her anyway, and it was upsetting me. Well, it wasn't upsetting to me for her to come see him. Even if we were granted adoption, sir, she can still come see him, but he doesn't know her.

Mrs. Baxter also expressed love for the child and a strong hope to adopt him.

John Shields, a son of Mrs. Baxter, testified next. He has known the appellant about 2½ or 3 years. While he was living at the Kingston Apartments, the appellant and her son moved in with him and his brother when McClain went to a hospital. She told him she was then engaged in prostitution. They slept with guns nearby because they were afraid a member of a rival motorcycle gang would break in and kill them. E.S.M. was neglected, was living in squalor, and was generally dirty and hungry. The worst he ever saw E.S.M. was one day when he came home from school, while the appellant was out working as a prostitute, and saw E.S.M. in his bed, covered with dung while the babysitter was watching TV and eating peaches. The bed was full of dung, the baby was crying and was filthy. Generally, he and his brother (John Price) were the only ones who cleaned E.S.M. up.

Shields disputed the appellant's claim that she has completely straightened out her life for the last four months. Two or 2½ months ago, she was living with a man named Tom. She got Shields to go with her to see E.S.M. about a month ago, and she tried to get him to give E.S.M. a $100 bill that she said she had gotten through prostitution.

Shields said the appellant and he had smoked marijuana during the last four months, and every time he has seen her she appeared to be high. He has frequently seen the appellant put E.S.M. to sleep by "supercharging." Drugs were frequently used around E.S.M., and he was in the presence of people that were using them. Shields said he was the one whose efforts led to the Baxters taking E.S.M. for the appellant, who didn't want him sent to a county home. He seems well adjusted with the Baxters except when the appellant comes out to see him. She cries and carries on that she wants him and has straightened her life out. Shields says he knows from what she has told him that she hasn't straightened it out and that the child has no life with a woman like her.

Shields admitted on cross-examination to an arrest at age 16. He invoked the fifth amendment when asked about his use of

drugs. He said he had not been convicted of any felony or misdemeanor involving moral turpitude.

Two of the Baxter's neighbors testified to their good home life and to E.S.M.'s good emotional growth.

Frank Pultar testified that within the last four months he had gone with John Shields to where the appellant was staying with some man. He was nervous there because it was a rough atmosphere and the people were smoking marijuana. He heard her say she had been involved in prostitution within the last four months. He has not been convicted in the last five years of any crime involving moral turpitude.

Stuart Kauftheil related that the appellant has worked for him in sales for 16 weeks at Super Pretzel of Texas. She is definitely an asset to his business and earns about $200 to $250 per week in commissions.

Mrs. Patricia Calkins, adoptive sister of the appellant, lives in New Jersey. Her mother boarded children, and the appellant was left with them for eighteen years. She hasn't been in contact with the appellant in the past four months except that she got a letter and came to Houston the morning of this hearing. She didn't know whether the appellant was married at age 15. She sent money to her for a lawyer when the appellant needed help.

The appellant later testified that she wants her baby back because she loves him and thinks he needs her. She doesn't want him to think she didn't want him. During the last two years she has worked towards getting him back, and she now feels that she is in a position to adequately care for him. She still knows the same men she knew before, but she does not "frequent" them. She has left the past behind and wants to take her son and go back to New Jersey with her adoptive sister. She explained: "I would take him to my sister's home, the home I was raised in, and it would be in the east where there would be no social pressures, and no one would call his father a nigger, and no one would call his mother a whore, and he would not be raised to believe that. He would not be raised to think his parents didn't want him."

She loved her son or she couldn't have left him. She knows it upsets him to see her and it upsets her to see him. She admitted that at any time during the past few years she could have straightened out her life.

■ We sustain the appellant's point that there is no evidence to support the trial court's finding 5 and agree that the wording of that finding is materially different from the provision of § 15.02(1)(A).

■ We also agree with the appellant that finding 6 is not supported by sufficient evidence. The proceedings in an action which permanently breaks the ties between a parent and child should be strictly scrutinized. *Wiley v. Spratlan,* 543 S.W.2d 349 (Tex.1976). The appellant's expression of intent to return was equivocal, and we cannot say from a preponderance of the evidence that she remained away from him for a period of at least three months when she was free to be with him.

■ We hold, however, that the trial judge was entitled to conclude, from the evidence in support of his finding of fact 7, that the appellant knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered his physical or emotional well-being. We also hold that the evidence supports the court's eighth finding of fact, that the appellant engaged in conduct which endangers the child's physical or emotional well-being.

We need not review the trial court's ninth finding of fact.

Finding of fact 10 states that the termination would be in the best interest of the child. A number of factors have been considered by the courts in ascertaining the best interest of the child, including these: "(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the

future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. This listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent. . . ." *Holley v. Adams,* 544 S.W.2d 367 (Tex.1976).

■ At the time of the trial the child had lived with the Baxters for two years, and their neighbors report that they maintain an emotionally stable and physically healthy atmosphere. The trial judge had an opportunity to observe the parties. The Baxters encouraged the appellant to visit with her son, but she rarely came. When she did visit, she often arrived late at night, appeared "high" or intoxicated, and upset her child because "she cries and carries on that she wants him back and has straightened out her life." An opinion was expressed that the appellant had not changed and that the child should not be returned to her.

■ The appellant apparently held a job during the 16 weeks immediately preceding the trial and asserted that she had dramatically altered her life, but the trial court was not required to accept the truth of her testimony as to her past actions or future intentions. The evidence in the record authorized the trial court to measure the appellant's future conduct by her recent deliberate past conduct as it may be related to the same or a similar situation. *DeLlano v. Moran,* 160 Tex. 490, 333 S.W.2d 359, 361 (1960). During the first 6 months of the child's life, she placed him in a dangerous atmosphere and admitted that she possibly used marijuana smoke as a tranquilizer. She then placed the entire parental responsibility and financial burden of her child on the Baxters for two years and did not ask for his return until they asked to keep him. They provided the physical necessities and emotional stability that he seemed to desperately need. They are the only family he has ever known, and he has now been with them for nearly four years.

■ There is a strong presumption that a minor's best interest is usually served by keeping custody in the natural parents. It is based on a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible, and, as well, the best atmosphere for the mental, moral, and emotional development of the child. *Wiley v. Spratlan,* 543 S.W.2d 349 (Tex.1976), citing *Mumma v. Aguirre,* 364 S.W.2d 220 (Tex. 1963).

We consider that the evidence in this case was sufficient to overcome that strong presumption and that the evidence supports the trial judge's decision that the best opportunities for the child's care and development would be provided if he thus made it possible for the Baxters to proceed with their adoption petition rather than returning the child to the appellant or continuing his status as a foster child.

Trial Court decisions in two related cases were also appealed by the appellant in our case: the Baxter's adoption proceeding has been transferred to the Court of Civil Appeals for the Eleventh District, at Eastland, and we are today issuing an unpublished opinion in the appellant's habeas corpus proceeding, styled "Ex parte E.S.M."

The judgment of the trial court is affirmed.