TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-03-00298-CV






James Wesley Schexnider, Appellant



v.



Texas Department of Family and Protective Services, Appellee (1)







FROM THE DISTRICT COURT OF MILLS COUNTY, 35TH JUDICIAL DISTRICT


NO. 20-10-5468, HONORABLE STEPHEN ELLIS, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N




 James Wesley Schexnider appeals from the termination of his parental rights to his
child, B.W.S. Appellant's rights were terminated based on multiple grounds. See Tex. Fam. Code
Ann. §§ 161.001(D), (E), (Q) (West 2002). We affirm the order of termination. (2)


Factual and Procedural Background



 Appellant has been incarcerated for capital murder since 1995; he is not eligible for
parole until 2027. (The particular facts of the murder will be discussed later in the opinion.) After
appellant's incarceration, B.W.S. lived with his biological mother, appellant's wife. Her parental
rights were terminated pursuant to her voluntary relinquishment of those rights. B.W.S. then lived
with his maternal great aunt, Elizabeth Ashworth, his court-appointed managing conservator. (3) 
B.W.S. began to develop serious emotional and behavioral problems. Although B.W.S. was in
counseling, the suggestion was made that Child Protective Services ("CPS" or "the Department" )
could provide more services because it was beginning to appear that B.W.S. might need twenty-four-hour-a-day care. Accordingly, at Ashworth's instigation, emergency proceedings were initiated to
have the Department appointed as temporary managing conservator, with Ashworth and Ashworth's
mother, Opal Duhon, named as possessory conservators. (Ashworth, Duhon, B.W.S., B.F., and
J.M.S. lived together.) At that time, CPS did not seek to terminate appellant's parental rights.

 During a series of permanency hearings, B.W.S. was showing improved behavior at
his therapeutic foster home. CPS ultimately moved to terminate appellant's rights because a
determination was made that B.W.S. might be adoptable, based on his progress. The foster mother
was amenable to a long-term placement although she was not sure if she would be able financially
to adopt B.W.S. After a bench trial at which he personally appeared, appellant's parental rights were
terminated. Appellant brings five issues on appeal, asking whether the trial court had jurisdiction
over B.W.S. (issue one); whether the evidence was legally or factually sufficient to support each of
the three grounds of termination (issues two, three, and four); and whether the evidence was legally
or factually sufficient to support the trial court's finding that termination was in B.W.S.'s best
interest (issue five).


Discussion



Jurisdiction Over B.W.S.


 Appellant contends that the Mills County District Court lacked jurisdiction because
a court of continuing, exclusive jurisdiction existed in Matagorda County and there was no evidence
to show that B.W.S. had lived in Mills County for the necessary six months to allow a transfer of the 
case to Mills County. See Tex. Fam. Code Ann. §§ 155.201(b), 262.203(a)(2) (West 2002). 
B.W.S.'s mother's parental rights were terminated in Matagorda County and Ashworth appointed
managing conservator in the same proceeding. However, B.W.S. had lived with Ashworth in Mills
County for three years before the initiation of the emergency proceeding that ultimately resulted in
termination. The record reflects a transfer to Mills County. Id. § 262.203(a)(2). We overrule
appellant's first issue.


Standard of Review for Termination


 Texas courts have long recognized that the natural right existing between a parent and
a child is one of constitutional dimensions. Ex parte Godeke, 355 S.W.2d 701, 702 n.1 (Tex. 1962). 
But the "rights of natural parents are not absolute; protection of the child is paramount . . . ." In re
A.V., 113 S.W.3d 355, 361 (Tex. 2003). Termination of parental rights is a drastic remedy and is
of such weight and gravity that due process requires the petitioner to justify termination by clear and
convincing evidence. Tex. Fam. Code Ann. § 161.206(a) (West Supp. 2004-05); In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002). The clear and convincing standard creates a higher burden to fulfill
because of the severity and permanency of terminating the parent-child relationship. On appeal,
then, an appellate court must also have a higher standard when reviewing the legal and factual
sufficiency of the evidence. Id. at 264-65; In re C.H., 89 S.W.3d 17, 26 (Tex. 2002). 

 In reviewing the legal sufficiency of the evidence to support a termination finding,
this Court looks at all the evidence in the light most favorable to the finding to determine whether
a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. 
J.F.C., 96 S.W.3d at 266. In doing so, we presume that the fact-finder settled disputed facts in favor
of the finding if a reasonable fact-finder could do so. Id. And we disregard all evidence that a
reasonable fact-finder could have disbelieved or found incredible. Id.

 When reviewing the factual sufficiency of the evidence supporting a termination
finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's
finding, is such that a fact-finder could reasonably form a firm belief or conviction about the truth
of the allegations. C.H., 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence
is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its
finding. J.F.C., 96 S.W.3d at 266. If the disputed evidence is so significant that a fact-finder could
not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. 
Id. 

 Section 161.001 of the Texas Family Code permits a court to order termination of
parental rights if two elements are established. First, the parent must have engaged in any one of
the acts or omissions itemized in the first subsection of the statute. Tex. Fam. Code. Ann.
§ 161.001(1). Second, termination of the relationship must be in the best interest of the child. Id.
§ 161.001(2). We turn now to the grounds for terminating appellant's parental rights.


Subsection Q


 One basis on which the court may order termination is that the parent has "knowingly
engaged in criminal conduct that results in the parent's imprisonment and inability to care for the
child for not less than two years from the date of filing the petition." Tex. Fam. Code. Ann.
§ 161.001(1)(Q). In his second issue, appellant contends that he produced evidence of his mother's
desire and willingness to care for B.W.S. Accordingly, he urges, the Department failed to prove this
ground by clear and convincing evidence.

 Incarceration alone does not justify termination. Texas Dep't of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re Caballero, 53 S.W.3d 391, 395 (Tex. App.--Amarillo 
2001, pet. denied). Accordingly, the "care" contemplated by subsection Q encompasses arranging
for care to be provided by another. Caballero, 53 S.W.3d at 396. Once the Department has
established the first prong of subsection Q, the parent must produce some evidence as to how he or
she would provide or arrange to provide care for the child during the period of incarceration. Id. 
at 396. When that burden of production is met, the Department then has the burden of persuasion
that the arrangement would fail to satisfy the parent's duty to the child. Id.

 Appellant's proposed arrangement for B.W.S.'s care was to have him live with Rosa
Hawes, appellant's mother. Appellant referred to his mother as having only one felony conviction. 
That felony conviction was for aiding and abetting appellant in disposing of the body of the victim
of the murder that led to appellant's incarceration. His mother also had recently married an inmate
that she met while visiting appellant. She had medical problems, among them recent foot surgery
and anxiety attacks when driving outside her own small town (Orange, Texas) that could interfere
with B.W.S. receiving therapy if a need arose for travel to a larger city for that therapy. (4)

 Bettina Knutson, the CPS supervisor for the case, testified that one felony would rule
out placement with that family member. Keri Farrell, B.W.S.'s CASA volunteer, also expressed
concern about placement with a convicted felon and with Hawes's anxiety attacks as a possible
interference with transportation to therapy.

 Ashworth testified that B.W.S.'s biological mother once took the children and stayed
with Hawes and would not return the children. When Ashworth finally retrieved the children, they
were hungry and dirty. Hawes threatened to kill Ashworth. After that episode, B.W.S. began to
manifest more severe emotional and behavioral problems. (5)

 After reviewing the evidence in the light most favorable to the finding, we conclude
that a reasonable trier of fact could have formed a firm belief or conviction that appellant's proposed
arrangement to care for B.W.S. was inadequate. See J.F.C., 96 S.W.3d at 266. Further, a review
of the evidence in support of and contrary to the trial court's finding leads us to conclude that the
fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. No
disputed evidence was so significant that a fact-finder could not reasonably have formed a firm belief
or conviction as to the inadequacy of appellant's arrangements for B.W.S. We overrule appellant's
second issue.

 A court may order termination if two elements are established: the parent has
engaged in any one of the acts or omissions itemized in the first subsection of the statute, see Tex.
Fam. Code. Ann. § 161.001(1), and termination is in the best interest of the child. Id. § 161.001(2). 
Having upheld one of the grounds for termination, we now turn to an analysis of the best interest of
the child. (6)


B.W.S.'s Best Interest


 A strong presumption exists that the best interest of the child is served by maintaining 
the parent-child relationship. In re G.M., 596 S.W.2d 846, 847 (Tex. 1980). In determining the best
interest of the child, a number of factors may be considered, including the following: (1) the desires
of the child; (2) the present and future physical and emotional needs of the child; (3) the present and
future emotional and physical danger to the child; (4) the parenting abilities of the person seeking
custody; (5) programs available to assist those persons in promoting the best interest of the child;
(6) plans for the child by those individuals or by the agency seeking custody; (7) stability of the home
or proposed placement; (8) the parent's acts or omissions which may indicate that the existing
parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. 
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).

 The absence of evidence about some of these considerations will not preclude a fact-
finder from reasonably forming a strong conviction or belief that termination is in the child's best
interest. C.H., 89 S.W.3d at 27. But the existence of scant evidence as to each Holley factor will
not support such a finding. Id. In a termination suit, our sole focus is the best interest of the child,
not the parent. D.O. v. Texas Dep't of Human Servs., 851 S.W.2d 351, 358 (Tex. App.--Austin
1993, no writ).

 The record reflects some evidence on all of the Holley factors. The trial judge 
interviewed B.W.S. in chambers. B.W.S. expressed a desire to have his father's parental rights
terminated and a preference to stay in his foster home. He expressed anger at his father for the crime
his father committed. However, he was not against contact by letter.

 There was evidence concerning B.W.S.'s present and future physical and emotional
needs. Dr. Richard Connell, Ph.D., a psychologist, diagnosed B.W.S. as suffering from attention
deficit hyperactivity disorder and posttraumatic stress disorder. He noted that B.W.S. needed
placement in a highly structured and closely supervised residential setting, such as a residential
treatment facility or therapeutic foster home. He was on psychotropic medication and would need
ongoing counseling. James Calloway, a licensed professional counselor, noted that in the last three
or four sessions leading up to the trial, B.W.S.'s behavior had regressed somewhat; reading a long
letter from his father to B.W.S. upset him. B.W.S. was angry at his father. Jay Paul Roy, a licensed
professional counselor, testified that B.W.S. suffered from post-traumatic stress disorder. He
expressed anger at his father, not sadness at being separated from him. There was testimony that he
was doing well in the therapeutic foster home. Ashley, Knutson, Ferrel, and Calloway all testified
expressly that they thought termination was in B.W.S.'s best interest.

 To evaluate the elements of present and future emotional and physical danger to the
child, the parent's acts or omissions which may indicate that the existing parent-child relationship
is not a proper one, and any excuse for the parent's acts or omissions, we must consider the evidence
surrounding the murder and appellant's account of that event. In short, the evidence discussed below
shows appellant consistently tried to minimize the offense and discounted any possible impact on
B.W.S.

 Appellant characterized himself as having a "clean" criminal record except for the
one offense that led to his conviction. However, appellant also described himself as having been a
"runner" for a major drug cartel, which most people would regard as criminal behavior. He testified
that he was approached by the FBI and asked to be a witness against the cartel. He says he did so,
but claimed that law enforcement then refused to put him in a witness protection program, leaving
him vulnerable to retaliation. King, the person he killed, was a drug dealer who often visited
neighbors across the street from appellant's mobile home in Vidor. Appellant would buy drugs from
King at a discount and then resell them for a profit, but professed that he was not a drug dealer
because he only sold drugs occasionally when he needed money.

 On the night of the murder, King asked appellant if he wanted to go for a ride. After
a while, appellant became suspicious that King was taking him to meet some members of the cartel
who would kill him. (7) Appellant pulled a gun on King and made him turn the car around to return
home. Eventually, they arrived at the mobile home, struggled, and appellant shot King. Then, in
an excess of caution to ensure that King was dead, appellant slit his throat. Appellant moved King's
body under his mobile home, then fled. He returned five days later, dismembered the body with a
saw, and he and his mother drove to Louisiana to dispose of the body.

 Appellant consistently tried to minimize the murder as one incident that happened in
the distant past. However, the murder occurred against a background of appellant's admitted drug
use and drug sales, which were occurring in close proximity to his family's residence. He left King's 
body under the mobile home where his wife and children lived; a place where it could have been
discovered by family members. Testimony about whether B.W.S. had seen any of these events was
mixed. B.W.S. said he did not remember seeing anything. However, in Ashworth's initial report
to CPS asking for help with B.W.S., she stated that she believed that the children witnessed the
murder and that B.W.S. had found body parts under the trailer. In spite of much testimony to the
contrary, appellant was fixated on the idea that all of B.W.S.'s problems were because his "daddy
couldn't hug him." Appellant testified that B.W.S.'s behavioral problems were not due to anything
appellant did but to their contact being limited.

 Appellant said he did not object to CPS being named as B.W.S.'s managing
conservator, but offered no real reason that leaving his parental rights intact inured to the child's best
interest. (8) Knutson, the CPS supervisor, testified that CPS did not allow prison visits. Calloway, one
of the therapists, testified that he did not know if it would benefit B.W.S. to have contact with his
father; in fact, he thought it might be actively detrimental. In response to a statement by appellant,
Calloway testified that he had never said that B.W.S. was traumatized by separation from Hawes. 
Although ordered not to do so, appellant made contact with B.W.S. during the trial proceedings.

 The only "excuse" offered by appellant for his criminal behavior was that he was in
fear because of his alleged activities as an informant and the law enforcement authorities' failure to
protect him. Appellant produced no corroboration for his statements. The trial court, as the fact-
finder, had the right to resolve credibility issues and conflicts within the evidence. It may freely
choose to believe all, part, or none of the testimony espoused by any particular witness. Ramo, Inc.
v. English, 500 S.W.2d 461, 467 (Tex. 1973); In re E.S.M., 550 S.W.2d 749, 757 (Tex.
App.--Houston [1st Dist.] 1977, writ ref'd n.r.e.) (judge entitled to disbelieve testimony of
biological parent).

 Appellant consistently tried to minimize the impact of his actions and refused to
acknowledge that his behavior might be a source of B.W.S.'s problems. He refused to acknowledge
that B.W.S. was angry at him. He seemed to view contact with himself as all the therapy that B.W.S.
needed. All of these factors made it likely that he would have difficulty maintaining an appropriate
relationship that would not cause emotional danger (9) to the child. By refusing to acknowledge
B.W.S.'s anger, appellant risks angering B.W.S. even more. He might discourage B.W.S. from
cooperating actively in therapy by insisting that contact with his father is all the therapy that B.W.S.
needed.

 The above evidence is also relevant to appellant's parenting abilities, any assistance
available to him, and plans for the child. Appellant will be in jail at least until 2027. Even within
the limited contact possible, he seemed unable to follow instructions about how to interact with the
child, even when those instructions came from the court. It really was not possible for him to make
future plans; he would not be eligible for release from prison until after B.W.S. was an adult.

 There was evidence about CPS's future plans for the child. Given the dearth of
alternatives, the plan to attempt to place B.W.S. for adoption was reasonable. Given that the
therapeutic foster mother had a son somewhat older then B.W.S. and an older foster son, she had
experience dealing with male adolescents and training to help her deal with B.W.S.'s special needs. 
B.W.S. was doing well and she was available for long-term placement; she had not ruled out
adoption.

 The Department has overcome the presumption that the best interest of the child is
served by maintaining the parent-child relationship. G.M., 596 S.W.2d at 847. The fact-finder could
reasonably have formed a strong conviction or belief that termination is in the child's best interest. 
See C.H., 89 S.W.3d at 27. Accordingly, we overrule appellant's fifth issue.


Conclusion 



 After concluding that the trial court had jurisdiction, we have reviewed the evidence
and hold that the record contained legally and factually sufficient evidence to support at least one
ground of termination and to support the proposition that termination was in B.W.S.'s best interest. 
Accordingly, we affirm the trial court's order terminating appellant's parental rights.



 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: April 7, 2005

1. See Act of June 2, 2003, 78th Leg., R.S., ch. 198, art. 1, § 1.01(a), 2003 Tex. Gen. Laws 611,
611 (changing name from Texas Department of Protective and Regulatory Services).
2. Appellant is represented on appeal by counsel. At trial, appellant represented himself pro se
with standby counsel.
3. Four children were the subject of this 1997 termination proceeding in Matagorda County. One,
B.F., a girl, was not appellant's child. The other three children were boys. Elizabeth Ashworth, the
maternal great-aunt, was named the managing conservator for B.F., B.W.S., and one of his brothers,
J.M.S. Virginia Elizabeth Ashworth, second cousin to the children, was named managing
conservator of the oldest boy, J.W.S. Appellant's parental rights were not terminated. The current
proceeding involves only B.W.S. The record does not reflect appellant's status with regard to his
rights to any of the other children.
4. Hawes was unable to travel to the trial because of recent surgery and anxiety about the trip. 
The record shows a deposition on written questions in which Hawes stated that she wanted to care
for B.W.S.
5. In response to a general inquiry about other possible relative placements, Knutson noted that
the only other potential relative placement would involve B.W.S. living next door to a registered sex
offender, his older brother who had been convicted as a juvenile of indecency with a cousin. Knutson
said that such a placement was highly unlikely.
6. The appellate court's opinion should address every issue raised and necessary to the final
disposition of the appeal while being "as brief as practicable." Tex. R. App. P. 47.1. "If the issues
are settled, the court should write a brief memorandum opinion no longer than necessary to advise
the parties of the court's decision and the basic reasons for it." Id. 47.4. Accordingly, we need not
reach appellant's third and fourth issues concerning alternative grounds for termination as our
sustaining one ground under section 161.001 is all that is necessary to the first prong of the
termination analysis.
7. Appellant was diagnosed as a paranoid schizophrenic when he first entered prison. He said that
he had bought drugs from King on the day of the murder.
8. It may well have been in appellant's best interest to continue to have limited access to the
children but the evidence is legally and factually sufficient to support the trial court's decision that
it was in the children's best interest to terminate appellant's parental rights in order to make possible
their future adoption." Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d 152,
159 (Tex. App.--Austin 1995) (citing In re D.O., 851 S.W.2d 351, 358 (Tex. App.--Austin 1993,
no writ)), rev'd in part on other grounds, In re C.H., 89 S.W.3d 17, 26 (Tex. 2002) (standard of
appellate review).
9. There was no claim that appellant ever physically abused B.W.S.