# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-03-00298-CV

**James Wesley Schexnider, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee[1]**

---

**FROM THE DISTRICT COURT OF MILLS COUNTY, 35TH JUDICIAL DISTRICT
NO. 20-10-5468, HONORABLE STEPHEN ELLIS, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

James Wesley Schexnider appeals from the termination of his parental rights to his child, B.W.S. Appellant's rights were terminated based on multiple grounds. *See* Tex. Fam. Code Ann. §§ 161.001(D), (E), (Q) (West 2002). We affirm the order of termination.[2]

### Factual and Procedural Background

Appellant has been incarcerated for capital murder since 1995; he is not eligible for parole until 2027. (The particular facts of the murder will be discussed later in the opinion.) After

---

[1] *See* Act of June 2, 2003, 78th Leg., R.S., ch. 198, art. 1, § 1.01(a), 2003 Tex. Gen. Laws 611, 611 (changing name from Texas Department of Protective and Regulatory Services).

[2] Appellant is represented on appeal by counsel. At trial, appellant represented himself *pro se* with standby counsel.

appellant's incarceration, B.W.S. lived with his biological mother, appellant's wife. Her parental rights were terminated pursuant to her voluntary relinquishment of those rights. B.W.S. then lived with his maternal great aunt, Elizabeth Ashworth, his court-appointed managing conservator.[3] B.W.S. began to develop serious emotional and behavioral problems. Although B.W.S. was in counseling, the suggestion was made that Child Protective Services ("CPS" or "the Department") could provide more services because it was beginning to appear that B.W.S. might need twenty-four-hour-a-day care. Accordingly, at Ashworth's instigation, emergency proceedings were initiated to have the Department appointed as temporary managing conservator, with Ashworth and Ashworth's mother, Opal Duhon, named as possessory conservators. (Ashworth, Duhon, B.W.S., B.F., and J.M.S. lived together.) At that time, CPS did not seek to terminate appellant's parental rights.

During a series of permanency hearings, B.W.S. was showing improved behavior at his therapeutic foster home. CPS ultimately moved to terminate appellant's rights because a determination was made that B.W.S. might be adoptable, based on his progress. The foster mother was amenable to a long-term placement although she was not sure if she would be able financially to adopt B.W.S. After a bench trial at which he personally appeared, appellant's parental rights were terminated. Appellant brings five issues on appeal, asking whether the trial court had jurisdiction over B.W.S. (issue one); whether the evidence was legally or factually sufficient to support each of

---

[3] Four children were the subject of this 1997 termination proceeding in Matagorda County. One, B.F., a girl, was not appellant's child. The other three children were boys. Elizabeth Ashworth, the maternal great-aunt, was named the managing conservator for B.F., B.W.S., and one of his brothers, J.M.S. Virginia Elizabeth Ashworth, second cousin to the children, was named managing conservator of the oldest boy, J.W.S. Appellant's parental rights were not terminated. The current proceeding involves only B.W.S. The record does not reflect appellant's status with regard to his rights to any of the other children.

the three grounds of termination (issues two, three, and four); and whether the evidence was legally or factually sufficient to support the trial court's finding that termination was in B.W.S.'s best interest (issue five).

## Discussion

### *Jurisdiction Over B.W.S.*

Appellant contends that the Mills County District Court lacked jurisdiction because a court of continuing, exclusive jurisdiction existed in Matagorda County and there was no evidence to show that B.W.S. had lived in Mills County for the necessary six months to allow a transfer of the case to Mills County. *See* Tex. Fam. Code Ann. §§ 155.201(b), 262.203(a)(2) (West 2002). B.W.S.'s mother's parental rights were terminated in Matagorda County and Ashworth appointed managing conservator in the same proceeding. However, B.W.S. had lived with Ashworth in Mills County for three years before the initiation of the emergency proceeding that ultimately resulted in termination. The record reflects a transfer to Mills County. *Id*. § 262.203(a)(2). We overrule appellant's first issue.

### *Standard of Review for Termination*

Texas courts have long recognized that the natural right existing between a parent and a child is one of constitutional dimensions. *Ex parte Godeke*, 355 S.W.2d 701, 702 n.1 (Tex. 1962). But the "rights of natural parents are not absolute; protection of the child is paramount . . . ." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and

convincing evidence. Tex. Fam. Code Ann. § 161.206(a) (West Supp. 2004-05); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). The clear and convincing standard creates a higher burden to fulfill because of the severity and permanency of terminating the parent-child relationship. On appeal, then, an appellate court must also have a higher standard when reviewing the legal and factual sufficiency of the evidence. *Id.* at 264-65; *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In reviewing the legal sufficiency of the evidence to support a termination finding, this Court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.,* 96 S.W.3d at 266. In doing so, we presume that the fact-finder settled disputed facts in favor of the finding if a reasonable fact-finder could do so. *Id.* And we disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's finding, is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *C.H.*, 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Section 161.001 of the Texas Family Code permits a court to order termination of parental rights if two elements are established. First, the parent must have engaged in any one of

the acts or omissions itemized in the first subsection of the statute. Tex. Fam. Code. Ann. § 161.001(1). Second, termination of the relationship must be in the best interest of the child. *Id*. § 161.001(2). We turn now to the grounds for terminating appellant's parental rights.

### Subsection Q

One basis on which the court may order termination is that the parent has "knowingly engaged in criminal conduct that results in the parent's imprisonment and inability to care for the child for not less than two years from the date of filing the petition." Tex. Fam. Code. Ann. § 161.001(1)(Q). In his second issue, appellant contends that he produced evidence of his mother's desire and willingness to care for B.W.S. Accordingly, he urges, the Department failed to prove this ground by clear and convincing evidence.

Incarceration alone does not justify termination. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re Caballero*, 53 S.W.3d 391, 395 (Tex. App.—Amarillo 2001, pet. denied). Accordingly, the "care" contemplated by subsection Q encompasses arranging for care to be provided by another. *Caballero*, 53 S.W.3d at 396. Once the Department has established the first prong of subsection Q, the parent must produce some evidence as to how he or she would provide or arrange to provide care for the child during the period of incarceration. *Id*. at 396. When that burden of production is met, the Department then has the burden of persuasion that the arrangement would fail to satisfy the parent's duty to the child. *Id*.

Appellant's proposed arrangement for B.W.S.'s care was to have him live with Rosa Hawes, appellant's mother. Appellant referred to his mother as having only one felony conviction. That felony conviction was for aiding and abetting appellant in disposing of the body of the victim

5

of the murder that led to appellant's incarceration. His mother also had recently married an inmate that she met while visiting appellant. She had medical problems, among them recent foot surgery and anxiety attacks when driving outside her own small town (Orange, Texas) that could interfere with B.W.S. receiving therapy if a need arose for travel to a larger city for that therapy.[4]

Bettina Knutson, the CPS supervisor for the case, testified that one felony would rule out placement with that family member. Keri Farrell, B.W.S.'s CASA volunteer, also expressed concern about placement with a convicted felon and with Hawes's anxiety attacks as a possible interference with transportation to therapy.

Ashworth testified that B.W.S.'s biological mother once took the children and stayed with Hawes and would not return the children. When Ashworth finally retrieved the children, they were hungry and dirty. Hawes threatened to kill Ashworth. After that episode, B.W.S. began to manifest more severe emotional and behavioral problems.[5]

After reviewing the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that appellant's proposed arrangement to care for B.W.S. was inadequate. *See J.F.C.*, 96 S.W.3d at 266. Further, a review

---

[4] Hawes was unable to travel to the trial because of recent surgery and anxiety about the trip. The record shows a deposition on written questions in which Hawes stated that she wanted to care for B.W.S.

[5] In response to a general inquiry about other possible relative placements, Knutson noted that the only other potential relative placement would involve B.W.S. living next door to a registered sex offender, his older brother who had been convicted as a juvenile of indecency with a cousin. Knutson said that such a placement was highly unlikely.

of the evidence in support of and contrary to the trial court's finding leads us to conclude that the fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. No disputed evidence was so significant that a fact-finder could not reasonably have formed a firm belief or conviction as to the inadequacy of appellant's arrangements for B.W.S. We overrule appellant's second issue.

A court may order termination if two elements are established: the parent has engaged in any *one* of the acts or omissions itemized in the first subsection of the statute, *see* Tex. Fam. Code. Ann. § 161.001(1), and termination is in the best interest of the child. *Id.* § 161.001(2). Having upheld one of the grounds for termination, we now turn to an analysis of the best interest of the child.[6]

### B.W.S.'s Best Interest

A strong presumption exists that the best interest of the child is served by maintaining the parent-child relationship. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). In determining the best interest of the child, a number of factors may be considered, including the following: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the person seeking

---

[6] The appellate court's opinion should address every issue raised and necessary to the final disposition of the appeal while being "as brief as practicable." Tex. R. App. P. 47.1. "If the issues are settled, the court should write a brief memorandum opinion no longer than necessary to advise the parties of the court's decision and the basic reasons for it." *Id*. 47.4. Accordingly, we need not reach appellant's third and fourth issues concerning alternative grounds for termination as our sustaining one ground under section 161.001 is all that is necessary to the first prong of the termination analysis.

custody; (5) programs available to assist those persons in promoting the best interest of the child; (6) plans for the child by those individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The absence of evidence about some of these considerations will not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. But the existence of scant evidence as to each *Holley* factor will not support such a finding. *Id*. In a termination suit, our sole focus is the best interest of the child, not the parent. *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ).

The record reflects some evidence on all of the *Holley* factors. The trial judge interviewed B.W.S. in chambers. B.W.S. expressed a desire to have his father's parental rights terminated and a preference to stay in his foster home. He expressed anger at his father for the crime his father committed. However, he was not against contact by letter.

There was evidence concerning B.W.S.'s present and future physical and emotional needs. Dr. Richard Connell, Ph.D., a psychologist, diagnosed B.W.S. as suffering from attention deficit hyperactivity disorder and posttraumatic stress disorder. He noted that B.W.S. needed placement in a highly structured and closely supervised residential setting, such as a residential treatment facility or therapeutic foster home. He was on psychotropic medication and would need ongoing counseling. James Calloway, a licensed professional counselor, noted that in the last three

8

or four sessions leading up to the trial, B.W.S.'s behavior had regressed somewhat; reading a long letter from his father to B.W.S. upset him. B.W.S. was angry at his father. Jay Paul Roy, a licensed professional counselor, testified that B.W.S. suffered from post-traumatic stress disorder. He expressed anger at his father, not sadness at being separated from him. There was testimony that he was doing well in the therapeutic foster home. Ashley, Knutson, Ferrel, and Calloway all testified expressly that they thought termination was in B.W.S.'s best interest.

To evaluate the elements of present and future emotional and physical danger to the child, the parent's acts or omissions which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the parent's acts or omissions, we must consider the evidence surrounding the murder and appellant's account of that event. In short, the evidence discussed below shows appellant consistently tried to minimize the offense and discounted any possible impact on B.W.S.

Appellant characterized himself as having a "clean" criminal record except for the one offense that led to his conviction. However, appellant also described himself as having been a "runner" for a major drug cartel, which most people would regard as criminal behavior. He testified that he was approached by the FBI and asked to be a witness against the cartel. He says he did so, but claimed that law enforcement then refused to put him in a witness protection program, leaving him vulnerable to retaliation. King, the person he killed, was a drug dealer who often visited neighbors across the street from appellant's mobile home in Vidor. Appellant would buy drugs from King at a discount and then resell them for a profit, but professed that he was not a drug dealer because he only sold drugs occasionally when he needed money.

9

On the night of the murder, King asked appellant if he wanted to go for a ride. After a while, appellant became suspicious that King was taking him to meet some members of the cartel who would kill him.[7] Appellant pulled a gun on King and made him turn the car around to return home. Eventually, they arrived at the mobile home, struggled, and appellant shot King. Then, in an excess of caution to ensure that King was dead, appellant slit his throat. Appellant moved King's body under his mobile home, then fled. He returned five days later, dismembered the body with a saw, and he and his mother drove to Louisiana to dispose of the body.

Appellant consistently tried to minimize the murder as one incident that happened in the distant past. However, the murder occurred against a background of appellant's admitted drug use and drug sales, which were occurring in close proximity to his family's residence. He left King's body under the mobile home where his wife and children lived; a place where it could have been discovered by family members. Testimony about whether B.W.S. had seen any of these events was mixed. B.W.S. said he did not remember seeing anything. However, in Ashworth's initial report to CPS asking for help with B.W.S., she stated that she believed that the children witnessed the murder and that B.W.S. had found body parts under the trailer. In spite of much testimony to the contrary, appellant was fixated on the idea that all of B.W.S.'s problems were because his "daddy couldn't hug him." Appellant testified that B.W.S.'s behavioral problems were not due to anything appellant did but to their contact being limited.

---

[7] Appellant was diagnosed as a paranoid schizophrenic when he first entered prison. He said that he had bought drugs from King on the day of the murder.

Appellant said he did not object to CPS being named as B.W.S.'s managing conservator, but offered no real reason that leaving his parental rights intact inured to the child's best interest.[8] Knutson, the CPS supervisor, testified that CPS did not allow prison visits. Calloway, one of the therapists, testified that he did not know if it would benefit B.W.S. to have contact with his father; in fact, he thought it might be actively detrimental. In response to a statement by appellant, Calloway testified that he had never said that B.W.S. was traumatized by separation from Hawes. Although ordered not to do so, appellant made contact with B.W.S. during the trial proceedings.

The only "excuse" offered by appellant for his criminal behavior was that he was in fear because of his alleged activities as an informant and the law enforcement authorities' failure to protect him. Appellant produced no corroboration for his statements. The trial court, as the fact-finder, had the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Ramo, Inc. v. English*, 500 S.W.2d 461, 467 (Tex. 1973); *In re E.S.M.*, 550 S.W.2d 749, 757 (Tex. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) (judge entitled to disbelieve testimony of biological parent).

Appellant consistently tried to minimize the impact of his actions and refused to acknowledge that his behavior might be a source of B.W.S.'s problems. He refused to acknowledge

---

[8] It may well have been in appellant's best interest to continue to have limited access to the children but the evidence is legally and factually sufficient to support the trial court's decision that it was in the children's best interest to terminate appellant's parental rights in order to make possible their future adoption." *Spurlock v. Texas Dep't of Protective & Regulatory Servs.*, 904 S.W.2d 152, 159 (Tex. App.—Austin 1995) (citing *In re D.O.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ)), *rev'd in part on other grounds*, *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) (standard of appellate review).

that B.W.S. was angry at him. He seemed to view contact with himself as all the therapy that B.W.S. needed. All of these factors made it likely that he would have difficulty maintaining an appropriate relationship that would not cause emotional danger[9] to the child. By refusing to acknowledge B.W.S.'s anger, appellant risks angering B.W.S. even more. He might discourage B.W.S. from cooperating actively in therapy by insisting that contact with his father is all the therapy that B.W.S. needed.

The above evidence is also relevant to appellant's parenting abilities, any assistance available to him, and plans for the child. Appellant will be in jail at least until 2027. Even within the limited contact possible, he seemed unable to follow instructions about how to interact with the child, even when those instructions came from the court. It really was not possible for him to make future plans; he would not be eligible for release from prison until after B.W.S. was an adult.

There was evidence about CPS's future plans for the child. Given the dearth of alternatives, the plan to attempt to place B.W.S. for adoption was reasonable. Given that the therapeutic foster mother had a son somewhat older then B.W.S. and an older foster son, she had experience dealing with male adolescents and training to help her deal with B.W.S.'s special needs. B.W.S. was doing well and she was available for long-term placement; she had not ruled out adoption.

The Department has overcome the presumption that the best interest of the child is served by maintaining the parent-child relationship. *G.M.*, 596 S.W.2d at 847. The fact-finder could

---

[9] There was no claim that appellant ever physically abused B.W.S.

reasonably have formed a strong conviction or belief that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Accordingly, we overrule appellant's fifth issue.

### Conclusion

After concluding that the trial court had jurisdiction, we have reviewed the evidence and hold that the record contained legally and factually sufficient evidence to support at least one ground of termination and to support the proposition that termination was in B.W.S.'s best interest. Accordingly, we affirm the trial court's order terminating appellant's parental rights.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: April 7, 2005