# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-11-00556-CV

A. H. and J. R., Appellants

v.

Texas Department of Family and Protective Services, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-FM-08-006288, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

M E M O R A N D U M   O P I N I O N

A. H. and J. R. appeal the trial court's final decree terminating their parental rights to their two children, K. R. and Ka. R., following a jury trial.[1] *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2011). Although they are represented by different counsel and filed separate briefs with this Court, appellants raise the same issues. They challenge the legal sufficiency of the evidence to support that statutory grounds exist for termination and the factual sufficiency of the evidence to support that termination of their respective parental rights was in the best interest of their children. They also contend that the trial court abused its discretion by denying their motions for new trial because jury misconduct deprived them of a fair trial. Because we conclude that the evidence was sufficient and that the trial court did not abuse its discretion by denying their motions for new trial, we affirm the trial court's final decree of termination.

---

[1] We use initials to refer to appellants and their children. *See* Tex. R. App. P. 9.8.

**BACKGROUND**

A. H. and J. R. became romantically involved in 2006. At that time, A. H. had a two year old child from a prior relationship. In February 2007, the police were called after J. R. allegedly pinned A. H. down and bit her. A. H. did not press charges or allow the police to take pictures of her injuries. Approximately one month later, the police responded to another call. A. H. and her mother had a physical altercation, and A. H. was intoxicated while caring for her child. A. H. allegedly resisted arrest, and her arm was broken by the police.

Appellants' first child, K. R., was born in January 2008. Shortly after K. R.'s birth, the Texas Department of Family and Protective Services became involved with appellants because A. H. admitted to smoking marijuana during her pregnancy. Although this case was eventually closed, the Department received multiple referrals during 2008 of neglectful supervision of A. H.'s children, physical abuse, and domestic violence. In one domestic violence incident that occurred in April 2008, the police were called and investigated allegations that J. R. had punched A. H.'s sister. The responding police officer reported that he saw J. R. leaving the scene in his car with K. R. unsecured in his lap. J. R. was charged with intentionally, knowingly, or recklessly causing bodily injury to A. H.'s sister, but the charge was dismissed after he entered into deferred prosecution.

Other alleged incidents of domestic violence occurred in August and November 2008. In August 2008, the police investigated allegations that J. R. broke down a bedroom door during an altercation with A. H., hitting A. H.'s older child in the face with the door. There also were allegations that J. R. held a knife to A. H.'s throat and threatened the neighbors. The police were called again in November 2008 after another altercation between J. R. and A. H. J. R. allegedly hit

2

A. H. "multiple times," pushed her to the ground, got in his car, and, as he was leaving, hit A. H.'s sister with the car. J. R. was charged and pleaded guilty to the offenses of assault and assault family violence. He was sentenced to confinement for one year in the Travis County jail and began serving his sentence in December 2008.

Shortly after the November 2008 incident, the Department filed an original petition affecting the parent-child relationship and was appointed temporary managing conservator of A. H.'s children.[2] The children were removed, and appellants were ordered to undertake and complete services. During the period of time that J. R. was in jail, A. H. cooperated with the Department, and her children were returned to her in March 2009. The Department continued to monitor A. H. and her children until August 2009. Around that time, the trial court entered an order appointing A. H. sole managing conservator of K. R. and appointing J. R. possessory conservator of K. R., but also ordering that J. R. not have contact with K. R. without further orders from the court. Despite this order, A. H. allowed J. R. to resume contact with K. R. a few days after J. R. was released from jail in November 2009, and appellants resumed their relationship without notifying the court or the Department.

The Department's next involvement with appellants occurred at the end of January 2010. The police and EMS were called to A. H.'s house because she allegedly swallowed cleaning product in an attempt to commit suicide.[3] K. R. was with her at the time. A. H. was taken

---

[2] A. H.'s oldest child was a subject of this suit originally, but he was placed with his biological father in 2010 and is no longer a subject of this suit.

[3] A. H. testified at trial that she did not actually attempt suicide and denied swallowing any cleaning product. She testified that she did not intend to hurt herself but to get attention.

to the hospital and then to a psychiatric hospital for a few days. She was diagnosed with major depression disorder and told that she was eight weeks pregnant.[4] At that time, appellants agreed with the Department to place K. R. with J. R.'s parents, to have only supervised contact with K. R., and to participate in services.

In February 2010, J. R.'s mother notified the Department that J. R. had taken K. R. from her home while the mother was asleep and that he had not returned for about one week. A Child Protective Services (CPS) investigator went to A. H.'s apartment to try to locate K. R. No one answered the door, but, as the investigator was leaving, she saw J. R. jump out of an apartment window and someone hand K. R. to him.[5] At this point, the Department sought and was appointed temporary managing conservator of K. R., and K. R. was placed in a foster home. Appellants remained subject to court orders requiring their participation in services in order to have K. R. returned to their care.

Appellants' second child, Ka. R., was born in August 2010. Within a few days of her birth, the Department was appointed temporary managing conservator of Ka. R. The Department removed her from the hospital and placed her in a foster home. After Ka. R. was born, appellants continued to participate in many of the court-ordered services and had separate supervised visits with their children. They denied being romantically involved after Ka. R. was born, but they sometimes arrived together for their respective scheduled visits with their children.

---

[4] Whether A. H. was aware that she was pregnant when she allegedly attempted suicide was disputed at trial.

[5] A. H. admitted at trial that she was the person who handed K. R. to J. R. through the window.

4

The jury trial occurred in August 2011 and lasted approximately two weeks. The Department called both appellants, questioning them about their relationships with each other, their contacts and interactions with the Department and the police, and their compliance with court orders. Appellants' testimony was unequivocal that they loved their children and wanted them back but was inconsistent or contradicted other evidence concerning their relationship with each other, their interactions with the Department and the police, and their compliance with court orders.

As to their relationship with each other, appellants agreed that their relationship had been unhealthy, but they testified that they had changed and that they were no longer in love with each other, ending their relationship in the middle of 2010. They both admitted, however, that they had separated and then gotten back together on numerous occasions during the course of their relationship, and the Department presented evidence that they were still involved with each other at the time of trial. Among this evidence, J. R. testified that A. H. "is going to be in my life for the rest of my life." The evidence also was undisputed that J. R. repaired A. H.'s car in April 2011 and drove it at other times and that the police were called to A. H.'s house in January 2011 to investigate alleged domestic violence. At that time, A. H. reported to the police that J. R. had pushed her and restrained her from leaving. On the assault victim statement, she listed the same address for herself and J. R., filled in "5" for the number of years that they had been dating, and checked the box that "family violence likely to occur in foreseeable future."

As to their interactions with the police and the Department, appellants admitted to some of the domestic violence that had been reported to the police, the Department, or as part of services, but they denied the extent of the violence. For example, A. H.'s testimony about an

5

argument with J. R. that occurred in April 2010 was inconsistent with a social worker's testimony and A. H.'s notes for a psychosocial evaluation written a few days after the incident. In her notes, A. H. wrote that J. R. "banged" her head into the car window during their argument, but, at trial, she denied that he had done so and testified that J. R. "pushed" her because he wanted her to get out of the car. The social worker testified that A. H. admitted to her that J. R. assaulted her a few days before the psychosocial evaluation.

Similarly, appellants admitted to drug use at certain times but not at other times. A. H. testified that her parents used illegal drugs while she and K. R. lived with them, that she had been intoxicated at times when she was taking care of her children, and that she used illegal drugs, including trying methamphetamine approximately five times for a two to three month span after K. R. was born, but she disputed a positive drug test from April 2011 for cocaine. She also explained that she had prescriptions for pain medications stemming from her broken arm in 2007, but, other than testimony, she did not present evidence of the prescriptions. Likewise, J. R. admitted to using marijuana and cocaine prior to March 2010, and to trying methamphetamine, but disputed the results of a positive drug test from December 2010.

As to their compliance with services and orders, appellants contended that they had participated and complied with the services required by the court, but they admitted that they had violated court orders. Among the orders that appellants admitted that they violated, A. H. took K. R. to see J. R. within days of his release from jail in 2009, and they resumed their relationship as a family. They also both admitted that they failed to comply with drug test requests, tested positive

6

for drugs, and failed to confirm or show up for some of their respective supervised visits with their children and appointments with counselors and therapists.

Other witnesses who testified on behalf of the Department included a psychiatrist, counselors, CPS caseworkers and investigators, the court appointed special advocate (CASA) supervisor, and K. R.'s therapist. The psychiatrist who treated A. H. after her attempted suicide in January 2010 testified that A. H. was depressed and "not functioning significantly." At the time of her discharge, she was diagnosed with "major depression disorder." The CPS caseworkers and investigators testified as to their particular involvement with appellants from the Department's initial involvement with the family to the time of trial, and the counselors testified concerning the particular services that they provided to appellants and appellants' progress from the services. These witnesses testified consistently that appellants had a history of domestic violence during their relationship.

Based on appellants' actions and progress, the Department's witnesses expressed concern about appellants' abilities to care for their children. For example, the conservatorship caseworker who was assigned to the case in March 2010 testified that appellants did not cooperate and were not truthful with her, including providing conflicting accounts of the extent of domestic violence and drug use and of the status of their relationship with each other.[6] She testified that her

---

[6] When asked what had led her to believe that A. H. was not being truthful about the status of her relationship with J. R., the caseworker testified:

> Last year they would come to the CPS office together even though pretty much from the moment I inherited the case from investigations the visits—the family visits with [K. R.] were separate, at separate times, usually not separate days, but they would arrive together. [A. H.] has told me about being in a car with him and he has stopped the car and thrown her phone in the middle of traffic and told her to get out on Ben White. I received a voicemail from [A. H.] around Thanksgiving time. What else?

7

relationship with J. R. was contentious from the beginning and that he cussed at her and made threatening statements. As to A. H., the caseworker testified that she did not comply with drug test requests, missed visits with her children, and did not attend therapy for a period of two months at the beginning of the year. The caseworker also testified as to the children's placement in foster care and recommended termination of appellants' parental rights.

Consistent with the caseworker's recommendation, the CASA supervisor and K. R.'s therapist recommended termination of appellants' parental rights. K. R.'s therapist, who was an individual play therapist and began working with K. R. in October 2010, explained her reasons for her recommendation, including her opinion that K. R. had witnessed domestic violence in the home. She testified that K. R. referred to J. R. as "monster daddy" and told the therapist that the play figures were "scared." The CASA supervisor's reasons for supporting the Department's position for termination included appellants' conflicting stories and lack of progress:

> Given their pattern as well as conflicting stories, sometimes I feel in past conversations with them they've admitted to some issues and then retracted some of those admissions during this trial. In addition, their pattern and the lack of accountability and the minimization is what has caused this case to happen.

* * *

---

I have seen [J. R.] walking his pit bull puppy at her apartment complex very late at night. I have seen [J. R.] come to the CPS office on more than one occasion for family visits—for his family visits in [A. H.]'s car this year. [A. H.] has acknowledged after a lot of questioning that he did have her car for a period of time in February, but then in April also she acknowledged that he had his car—he had her car. . . .

As I stated before, I haven't seen the progress that I feel that the parents need to have made to provide a safe, healthy environment for both of their children. And I don't know that they could make that progress as time goes on.

The CASA supervisor also testified that the children were well adjusted and extremely bonded with their foster parents and that they were making progress in the stability of their current placement.

The foster mother and multiple police officers also testified on the Department's behalf. The foster mother testified that K. R. and Ka. R. were placed in her home in October 2010, that they were bonded, that the children were doing well in her care, and that she and her husband hoped to adopt the children if appellants' parental rights were terminated. Although she testified that K. R. referred to J. R. as "monster daddy" and appeared scared after visits with him, she was open to allowing appellants to remain in the children's lives if it was safe and appropriate.[7]

The police officers testified to their respective responses and investigations from 2007 through January 2011 involving allegations of drug use and domestic violence between appellants and other family members. The police officers' testimony and other evidence as to what happened and what appellants said and did during their investigations often contradicted the testimony of A. H. and J. R. For example, A. H. testified that the door did not hit her older child during her altercation with J. R. in August 2008, but the police officer who responded to the call testified that A. H. told

---

[7] The foster mother explained her reason for planning to allow appellants to remain in their children's lives if she was allowed to adopt them:

I believe very strong—I was adopted myself and I know my biological mother. And I feel very strongly that it's so important to know where you came from and to have that connection. And [K. R.] and, you know, [Ka. R.] know their—you know, know their parents, and I'm sure that they will want to know them and love them, you know, in the future . . . .

him that J. R. "busted down the door" and that was when the child's face was injured. The police officer also testified that he saw a bump on the child's face.

Other examples of inconsistent testimony concerned the incidents in November 2008 and January 2010. As to the incident in November 2008, A. H. testified that she was fighting with J. R. over a basket and fell down and that her sister jumped on J. R.'s car, but the police officer testified that A. H. told him at the time that J. R. "hit her with closed fists, open hands multiple times" and hit her sister with the bumper of his car. Photos of the injuries to A. H. and her sister from this incident were admitted into evidence. As to the January 2010 incident, the police officer who responded to the suicide attempt testified that A. H. told him that she had taken "three gulps of bleach," but A. H. testified that she did not drink any cleaning product. A. H. explained that she was not truthful about the suicide attempt "because [she] wanted [J. R.] to come back home."

Witnesses who testified on J. R.'s behalf were J. R., a neighbor, a high school friend, and A. H.'s sister. J. R. admitted to pushing A. H. on several occasions and holding her down, but he denied many of the allegations of domestic violence or the extent of the violence and he testified that he never hurt his children. He also testified that he was a different person, that some of the services provided by the Department had helped him, including that he had learned how to control his anger, that he had a good job, and that he loved and wanted his children back. J. R. blamed the Department and accused the conservatorship caseworker assigned to the case of lying. He testified that his children were taken "out of spite" and that the Department did not care. The neighbor testified that J. R. was a good father and had a good relationship with his parents and that she would trust him to take care of her granddaughter. J. R.'s friend testified that J. R. was a "good friend" and

10

a "good guy." A. H.'s sister testified that J. R. never hit or kicked or hurt her and that she told the police that he had done those things because she did not like J. R. as a boyfriend to her sister. The sister also testified that she thought J. R. was a good dad and that A. H. and J. R. could co-parent.

The main witness to testify on behalf of A. H. was a counselor at SafePlace. A. H. first met with the counselor in October 2010 and did approximately 22 sessions with her. The counselor testified that, although she closed her file in March 2011 because A. H. was out of touch with her, she agreed to resume counseling in May 2011. The counselor testified that she was very concerned with the conservatorship caseworker's conduct in this case and was in the process of filing a formal complaint against her. She also testified that she did not believe that the Department had made reasonable efforts to return the children to A. H. The counselor, however, testified that she considered J. R. to be "very dangerous" to the children based on the information that she had, that there was a risk of harm to children if they were returned to J. R., and that she was "concerned for the children regardless of the information [A. H.] provided because of the history of domestic violence." She also provided testimony about the cycle of domestic violence, its effect on children, how children are just as much the victims, and how the violence can interfere with the children's needs being met.

The trial court submitted the case to the jury, and the jury found that appellants' parental rights should be terminated for both children. In accordance with the jury's findings, the trial court entered the final decree terminating appellants' parental rights and appointing the Department sole managing conservator.

Appellants filed motions for new trial. Among their grounds asserted, they alleged jury misconduct. The trial court held a hearing on the motions for new trial. J. R. testified at the hearing that he had several conversations with one of the jurors during the course of the trial. J. R. testified that the juror told him not to worry and that they discussed the case, including how particular jurors were leaning. J. R. testified that his attorney and A. H. did not know about his conversations with the juror until after the verdict. An attorney for the Department also testified that she had been approached by one of the jurors twice during the trial but she did not report the contact to the court because the communications were not about the case and "extremely brief." After hearing the evidence, the trial court denied both motions for new trial. This appeal followed.

**ANALYSIS**

To terminate parental rights, the Department has the burden to prove one of the predicate grounds in section 161.001(1) of the family code and that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is the clear and convincing standard. Tex. Fam. Code Ann. § 161.206(a) (West 2008); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (due process requires clear and convincing standard of proof in parent termination cases). The clear and convincing standard is "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code Ann. § 101.007 (West 2008) (defining clear and convincing evidence). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and

12

physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Appellants raise legal and factual sufficiency challenges to the evidence. Legal sufficiency review of the evidence to support a termination finding requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence to support a termination finding, a court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* (citing *In re C.H.*, 89 S.W.3d at 25); *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (describing factual sufficiency standard of review in appeals from termination orders). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

***Predicate Statutory Ground***

In their first issues, appellants challenge the legal sufficiency of the evidence to support that statutory grounds exist for termination. The Department sought termination based upon the same three statutory grounds for both appellants:

- the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

13

- the parent has . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; and

- the parent has . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent . . . for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(1) (D), (E), (O). Because the termination decree can stand on one statutory ground plus a best interest finding, we limit our review to the second ground—that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of their children. *See In re A.V.*, 113 S.W.3d at 362 (explaining that only one predicate ground necessary to support termination of parental rights when there is also best interest finding).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted).

14

Appellants both argue that the evidence was legally insufficient to support an endangerment finding as to Ka. R. because she was removed from the hospital when she was just a few days old and placed in foster care, and A. H. argues that "much of the endangerment in question happened long before the advent of this particular [CPS] case." But subsection (E) of section 161.001 does not require the endangerment to have occurred during a certain time period, *see* Tex. Fam. Code Ann. § 160.001(1)(E), and the court "may look to parental conduct occurring both before and after the child's birth." *In re M.E.-M.N.*, 342 S.W.3d at 262 (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)).

In this case, appellants' own testimony established that their "course of conduct" had exposed their children to injury. *See id*. A. H. admitted to smoking marijuana while she was pregnant with K. R. and to using methamphetamine after K. R. was born, and evidence showed that A. H. attempted suicide while K. R. was in her care and she was pregnant with Ka. R. J. R. also admitted to using illegal drugs during the course of the Department's investigation, and there was evidence of continued domestic violence, including that J. R. pushed A. H. while she was holding K. R. and that he assaulted A. H. during her pregnancy with Ka. R.

Based upon this evidence of domestic violence, illegal drug use, and A. H.'s suicide attempt during her pregnancy with Ka. R., the jury "could have formed a firm belief or conviction" that appellants "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the [children]." *See* Tex. Fam. Code Ann. § 160.001(1)(E); *In re J.F.C.*, 96 S.W.3d at 266; *see also In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Robinson v. Texas*

15

*Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (parent's illegal drug activity after agreeing not to commit such acts in plan for reunification "established clear and convincing proof of the parent's voluntary, deliberate, and conscious conduct that endangered the well-being of her children"); *id*. at 687 n.11 (use of illegal drugs during pregnancy "may be considered endangering a child" (citation omitted)); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child." (citation omitted)); *Pruitt v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *15 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.) (evidence of drug use both before and after child's birth relevant to issue of endangerment and "evidence that a parent abused drugs while children were in her custody supports a finding of termination" (citation omitted)).

We conclude that the evidence was legally sufficient to support one of the predicate grounds for termination for both appellants. *See* Tex. Fam. Code Ann. § 160.001(1)(E); *In re J.F.C.*, 96 S.W.3d at 266. We, therefore, overrule appellants' first issues.

### Best Interest Finding

In their second issues, appellants challenge the factual sufficiency of the evidence to support findings that termination of their respective parental rights was in the best interest of their children. *See* Tex. Fam. Code Ann. § 161.001(2); *In re J.F.C.*, 96 S.W.3d at 266; *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). Appellants both argue that there was no evidence that termination was necessary and that there were relatives available to raise the children.

16

Factors that courts consider in assessing the best interest of a child include: (i) stability of the home or proposed placement, (ii) parental abilities, (iii) the emotional and physical needs of the child now and in the future, (iv) the emotional and physical danger to the child now and in the future, (v) the plans for the child by the individual or agency seeking custody, (vi) conduct by a parent showing parent-child relationship not proper, and (vii) any excuses for the parent's conduct. *Holley*, 544 S.W.2d at 372; *see also* Tex. Fam. Code Ann. § 263.307 (West 2008) (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28; *Pruitt,* 2010 Tex. App. LEXIS 10272, at *22 –23 (citation omitted).

Appellants presented evidence that it was not in their children's best interest to terminate their respective parental rights. Appellants and other witnesses testified that appellants loved their children, that they wanted to take care of their children, that they had made progress and completed court-ordered services, that they were bonded with their children, and, at the time of trial, they were no longer in a romantic relationship and that they both had jobs and places to live. The evidence, however, was undisputed that appellants had been involved in domestic violence both before and during their children's lives, that J. R. spent a significant amount of K. R.'s life in jail, and there was evidence of drug use by both parents. *See In re S.D.*, 980 S.W.2d 758, 763–64 (Tex. App.—San Antonio 1998, pet. denied) (parent's failure to provide a stable home for children free

from drug use was evidence supporting adverse best interest finding); *see also In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (parent's "minimal efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect").

The jury also could have credited the testimony from other witnesses that supported findings that appellants were not ready to provide their children with a safe and stable home. K. R.'s therapist, the CASA supervisor, and the conservatorship caseworker all testified as to their concerns if the children were returned to either of the appellants. J. R.'s most recent counselor, who had been working with him since March 2011, testified that she hoped that he could be a safe parent but that she could not "say at this time definitively anything because it's too early in his treatment" and that he needed further treatment because domestic violence is "an easy thing to slip back into." A. H.'s counselor at SafePlace also expressed concern because J. R. was "dangerous" and there was a history of domestic violence.

Although appellants testified they were no longer in a relationship and minimized the extent of domestic violence in the past, the jury could have disbelieved them and credited contrary evidence that appellants were still in a relationship with each other, that the domestic violence had been extensive, and that it was likely to recur. *See In re H.R.M.*, 209 S.W.3d at 108 ("In reviewing termination findings for factual sufficiency, a court of appeals must give due deference to a jury's factfindings, . . . and should not supplant the jury's judgment with its own." (internal citation

18

omitted)); *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (holding that "jury was not required to ignore a long history of dependency and destructive behavior merely because it allegedly abated before trial" and, because parent failed to appreciate the need for treatment, "jury could infer that [parent]'s substance abuse . . . issues were likely [to] recur and further jeopardize [child]'s well-being"); *In re E.S.M.*, 550 S.W.2d 749, 757 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) (holding that trial court as finder of fact may disbelieve parent's claims that she had "dramatically altered her life").

The jury could have credited the testimony from the conservatorship caseworker and police officers, physical evidence such as photographs showing injuries to A. H., and the victim statement that A. H. filled out in January 2011. A. H. listed the same address for appellants, "5" years for the length of their relationship, and checked the box that "family violence likely to occur in foreseeable future." J. R. also testified that A. H. "is going to be in my life for the rest of my life." Appellants' admission to breaking up and getting back together multiple times during their relationship also conformed with the evidence of the cycle of domestic violence.

The evidence further showed that appellants disregarded court orders and were willing to be untruthful when necessary to get what they wanted. A. H. testified that she "stretched the truth" to the police to get what she wanted at different times and was not truthful about her suicide attempt because she was trying to get J. R.'s attention. Likewise, J. R. denied or minimized physical altercations with A. H. As to their disregard of court orders, the evidence showed that A. H. applied for and was granted emergency protective orders, but appellants admitted that they did not abide by these orders or the order in August 2009 that precluded J. R. from having contact with K. R.

19

without further orders from the court. They also admitted that they did not abide by their agreement with the Department after A. H.'s suicide attempt in 2010 that they would have only supervised visits with K. R. The evidence was undisputed that J. R. took K. R. to A. H.'s apartment and, when the investigator came to the apartment to try to locate K. R., approximately one week later, no one answered the door and, shortly thereafter, A. H. handed K. R. through a window to J. R. after he jumped out of the window.

The Department also presented evidence that appellants had failed to confirm or missed scheduled visits with their children, that the children were doing well in their current placement, and that the Department's plan for the children was adoption by their current foster parents if appellants' rights were terminated. The jury could have credited this evidence, as well as the evidence of the Department's extensive and continued involvement with appellants and their children, to form a firm belief or conviction that termination of appellants' parental rights was in the best interest of the children. *See In re J.F.C.*, 96 S.W.3d at 266.

We conclude that the evidence was factually sufficient to support that termination of appellants' parental rights was in the best interest of the children and, therefore, overrule appellants' second issues.

### Jury Misconduct

In their third issues, appellants challenge the trial court's denial of their motions for new trial. A trial court's decision to deny a motion for new trial is reviewed for abuse of discretion. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 375 (Tex. 2000); *Pharo v. Chambers Cnty.*, 922 S.W.2d 945, 949 (Tex. 1996). A trial court abuses its discretion when it acts without regard to

20

any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Appellants asserted in their motions for new trial that they were denied a fair trial based upon juror misconduct and argue that any juror misconduct in a termination case should be grounds for a new trial. At the hearing on their motions, J. R. testified that he would have testified and behaved differently during the trial if he had not been approached by a juror.[8] J. R. testified that the juror told him, among other things, "don't worry" and that he had his "back" and that he discussed the case with the juror, including "what some of the thoughts of the jury were." J. R. testified as to one of the conversations:

> And, you know, basically [the juror] just—he guaranteed me just don't worry; I'm going to make sure you win; don't worry about a thing. He also told me which jurors were gunning for us, which ones were in our favor and, you know, stuff like that.

J. R. relies upon the 10 to 2 verdict to support his positions that his communication with the juror and the resulting change in his testimony and behavior because of the communication probably resulted in injury. A. H. also refers to J. R.'s testimony at the motion for new trial hearing, asserting that J. R.'s "testimony changed because of his contact with a juror." Like J. R., A. H. does not state how J. R.'s testimony was affected by the alleged juror contact.

Rule 327(a) of the rules of civil procedure addresses allegations of juror misconduct. It states in relevant part:

---

[8] One of the jurors also testified at the hearing, but that juror was not the juror that J. R. alleged that he spoke with during the trial.

When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury . . . , the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved . . . be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

*See* Tex. R. Civ. P. 327(a). "Whether misconduct occurred and caused injury is a question of fact for the trial court." *Golden Eagle Archery, Inc*., 24 S.W.3d at 372 (citing *Pharo*, 922 S.W.2d at 948). "Absent findings to the contrary, we must assume that the trial court made all findings in support of its decision to deny the motion for new trial." *See id.* Consequently, A. H. and J. R. had the burden to conclusively establish the alleged jury misconduct and that injury probably resulted.

Given that the evidence of J. R.'s communications with the juror was solely from J. R. and J. R.'s testimony during the trial that was inconsistent and contradicted by other evidence, the trial court could have discounted his testimony as not credible and concluded that, even if the communications occurred, that they did not cause J. R. to testify or behave differently during the trial. *See id.*; *see also McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (when acting as the finder of fact, trial court "sole judge of the credibility of the witnesses and the weight to be given to their testimony"). Appellants did not provide concrete details of how J. R.'s testimony would have been different. There also was no testimony from a juror to support a finding that the juror would have voted differently had J. R. behaved or testified differently during the trial. *See Pharo*, 922 S.W.2d at 950 ("To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he 'would otherwise have done

22

on one or more issues vital to the judgment.'" (citation omitted)). Even as to the juror who was involved in the alleged communications with J. R., the juror voted in favor of the Department.

Appellants argue that *any* jury misconduct in termination cases requires a new trial. "The Texas Supreme Court has recognized certain limited types of misconduct that are 'so highly prejudicial and inimical to fairness' that probable injury is established, *prima facie*, by simply showing the improper act." *See Sharpless v. Sim*, 209 S.W.3d 825, 828 (Tex. App.—Dallas 2006, pet. denied) (citing *Texas Emp'rs' Ins. Ass'n v. McCaslin*, 317 S.W.2d 916, 921 (Tex. 1958)). "[C]onduct that equated to jury tampering" fell within this type of misconduct. *See id.* But, in *McCaslin*, it was the defendant who sought a new trial based upon the plaintiff's conduct of engaging a juror in conversation "to influence [the juror]'s actions as a juror." 317 S.W.2d at 918. Unlike here, the party seeking a new trial was not the party involved in the improper conduct or an aligned party.**⁹** *Id.* Further, the issue being addressed in *McCaslin* was the type of jury misconduct,

---

**⁹** At the hearing, the trial court stated his concern with allowing a party to take affirmative improper actions to influence a juror and then to seek a new trial based upon his improper actions:

> [J. R.] is clearly imploring the juror to do all he can to help him. There's no doubt we can infer that that's what occurred. What dad did was basically imbed the right to a motion for new trial for the department. If he had managed to get a successful jury verdict, he and mom, the department would be entitled to a new trial. Why? Because dad's communication clearly in the law would require me to find probable harm. That is to say, he's lobbying a juror; he wins the case; the other side is entitled to a new trial.
>
> I don't have a single case . . . in which the party, arguably tampering with the jury, having inappropriate conversations with the jury, giving the jury information and imploring the jury to help him—I don't have a single case in which that party lost and based upon their improper communication with the jury was entitled to a new trial. And one can easily see why because then in every case it would be a smart thing to do to go talk to the jurors in the hallway. Why? Because if you win, you won; if you lose, you're entitled to a new trial. Why? Because of your own wrongful

23

not the type of case. Appellants have not cited, and we have not found, authority to support that our review of the alleged jury misconduct is different because this is a termination case. We, therefore, decline to presume probable injury here.

Viewing the record as a whole, there was ample evidence to support the jury's findings to terminate appellants' parental rights. Based upon the record as a whole then, the trial court could have concluded that appellants failed in their burden to show that injury probably resulted from the alleged juror misconduct. *See* Tex. R. Civ. P. 327(a). On this record, we conclude that the trial court did not abuse its discretion by denying appellants' motions for new trial and overrule appellants' third issues.

## CONCLUSION

Having overruled appellants' issues, we affirm the trial court's final decree of termination.

_____

conduct. It would turn the law on its head, and it would invite people to willfully, cravenly violate their obligations not to talk to the jury.

As to A. H., the trial court explained that the analysis was different but that he did not find probable harm "given the alignment of the parties."

_____

Melissa Goodwin, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed:  May 18, 2012