

# NUMBER 13-21-00447-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF K.Y.T., E.J.T., AND J.T., CHILDREN

**On appeal from the County Court at Law No. 5
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Benavides**

Appellant R.T. (Roger)[1] appeals from the trial court's final order in a suit affecting the parent-child relationship that named him possessory conservator of his three children. In three issues, which we analyze as one, Roger argues the trial court erred by not appointing him managing conservator of Jordan, Emilio, and Kate. We affirm.

---

[1] On our own motion, we identify the parties and children in this case by fictitious names. *See* TEX. FAM. CODE ANN. § 109.002(d).

## I.  BACKGROUND

The children in this case are Kate, Emilio, and Jordan, ages seventeen, fourteen, and fourteen, respectively, at the time of the final hearing. Their parents are Roger and Julia. On May 27, 2020, the Texas Department of Family and Protective Services (Department) filed an original petition for the protection of Kate, Emilio, and Jordan.[2] The petition also requested the termination of Roger's and Julia's parental rights. In the supporting affidavit, Child Protective Services Specialist, Lavada Gotcher, detailed part of the protracted history of the Department's interactions with the children of this case. The final hearing began on August 17, 2021.

### A.  Affidavit in Support of Removal

According to the affidavit, on May 3, 2019, the Department received a report concerning the neglectful supervision of Kate by Roger. It was reported that Kate attended a carnival with a family member and the police were later called because it seemed Kate, who was fourteen years old at the time, was "very intoxicated." The police, in turn, called an ambulance, Kate was taken to the hospital, and the following exchange between Roger and a Department caseworker was documented:

> [Roger] stated he has been doing what he can and going to counseling. I asked him about his daughter's substance abuse and [Roger] stated he asked her what she was on and [Kate] said alcohol. [Roger] stated that alcohol is legal, and I replied to him not for a minor[,] she is not twenty[-]one years old. [Roger] stated that [Kate] told him at the carnival some man bought her an MD 40 from the store. [Roger] admitted to knowing about her marijuana use and [had] seen her come home like this before. [Roger]

---

[2] A fourth child, Ian, resided with Julia prior to the initiation of the underlying suit but was not included in the case before us.

2

admitted to not taking her to the hospital when she did . . . ."

The record indicates that Kate's drug screen tested positive for "THC, alcohol, Xanax, and Tricyclics, an anti-depressant." Additionally, Kate's blood pressure was "very low." An exigent removal was performed by the Department, but the trial court later denied the removal and ordered Kate and Roger to participate in certain services.

The affidavit asserted that as the case progressed, Roger refused to participate in substance abuse and family counseling services, tested positive for methamphetamine, refused to submit to hair follicle screens, and failed to provide competent supervision for his children. The affidavit also alleged that throughout the case, Kate, Emilio, and Jordan had erratic school attendance and were all "discharged" from school for excessive absences. For instance, the affidavit details that Emilio was "discharged on November 4, 2019[,] due to having 10 consecutive absences and was not enrolled until January 31, 2020. [Emilio] was then again discharged on February 21, 2020[,] for another 10 consecutive absences." On January 29, 2020, Kate and Roger appeared at Kate's school and both gave a "bunch of excuses" for Kate's absences to the truancy officer. The truancy officer explained that Kate and Roger were supposed to return the next day to re-enroll her, but they did not show up at the scheduled meeting. On March 5, 2020, it was discovered that Kate "had missed 99 days of school" that academic year.

The affidavit detailed that Kate informed the Department caseworker that Roger "does not care that she smokes marijuana and she often comes home high." "[H]e usually makes fun of her because of the way she talks[,] and it makes her laugh." Jordan also

3

reported seeing "syringes inside Corona beer bottles" around the home and that "he has seen his father and someone else sniff something with a" rolled up bill. According to the affidavit, Roger "admitted to struggling with parenting, as he has anger problems which lea[d] him to las[h] out at his children physically and verbally."

According to the affidavit, on January 27, 2020, while attempting to purchase marijuana, Kate was held up by an unknown assailant at gunpoint. On May 24, 2020, the Department received a report that Roger's adult tenant, along with Kate and Emilio, kidnapped a disabled child who had been placed with the child's grandmother by the Department. It was alleged that the tenant displayed a gun during the kidnapping. The child was later brought to the hospital for treatment. The record indicates that Kate, Emilio, and Jordan were removed from Roger's care following this incident and the Department was appointed as temporary managing conservator.

The affidavit also details that throughout the entirety of the Department's investigation, Julia, the children's mother, lived in Indiana. Ian, the children's brother, went to live with Julia in February 2020. He reported being "very happy" living with his mother.

B.    Richard Reyes's Testimony

At the final hearing, Richard Reyes, a caseworker for the Department, testified concerning Roger's progress in this case. According to Reyes, Roger successfully completed individual therapy and intensive outpatient therapy for his drug issues in March 2021. However, in April 2021, Roger tested positive for methamphetamines and amphetamines. Reyes testified that Emilio and Jordan had since been placed with Julia

4

in Indiana, and Julia had reached out for additional resources to help get the boys settled.

The clerk's record indicates that Kate was given the choice to either accompany her brothers to Indiana or remain in Corpus Christi with a fictive kin caretaker. Kate chose the latter option and was placed with Betty, a friend's mother. Regarding Kate, Reyes testified, "[Kate] is very headstrong, very independent, sometimes makes her own assessments as far as everything. So, yeah, she's a very smart individual."

Reyes testified that on May 11, the court suspended Roger's unsupervised visitation with the children until he completed inpatient treatment. However, according to Reyes, on June 16, 2021, the inpatient facility informed him "that nobody under the name of [Roger] had checked in or started services with them." Reyes confirmed that, at that point, Roger should have already been weeks into his court-ordered treatment. Reyes testified that he tried checking in with Roger on June 9, June 17, and June 22, but did not receive a response from Roger until July 1. On July 1, Roger informed Reyes "that he had been having trouble trying to get into the service."

According to Reyes, since Emilio and Jordan had been placed with Julia, Emilio had been arrested for stealing a golf cart. However, Reyes also affirmed that Julia properly addressed the legal issues Emilio faced and was supportive of him accepting responsibility for his actions. Reyes believed that things were "moving in a positive direction," and that placement with Julia was in the boys' best interest due to the "change of scenery" and their ability to now spend time with their older sibling, Ian. Reyes testified that the boys were starting to adjust and make friends with children their own age. Reyes

5

further testified that when the children visited friends, Julia made sure to be "in contact with [the] parent of that child and also in contact with her children." Reyes also mentioned that the older brother, Ian, "actually loved it out there and wanted to stay over there."

However, Reyes also testified that all three children wished to return to Roger's care.

## C.      Heather Tijerina's Testimony

Heather Tijerina, a CASA supervisor, testified in her role as the chairperson for the Nueces County Family Drug Court. Tijerina explained that the inpatient treatment facility informed her that no one by Roger's name had completed an assessment and no one by Roger's name was waiting for admission. Tijerina also testified that the facility informed her that beds were available during the period Roger was ordered to complete treatment.

Tijerina also testified, without expounding, that it was in the boys' best interest to remain with Julia, and it was in Kate's best interest to remain with her fictive kin caretaker, Betty.

## D.      Ariel Burger's Testimony

Ariel Burger, a supervisor at the Department, testified to Roger's neglectful supervision. According to Burger, Roger disclosed to the Department on April 29, 2021, that he "would put meth in his coffee" and Roger claimed that "he's actively been taking methamphetamine for pain and is not a social user or an addict." Burger testified that she believed Roger's drug use escalated to the level of neglectful supervision and contributed to some of the danger his children, especially Kate, encountered. According to Burger,

"[Roger] did know that [Kate] was using marijuana and, at times, would laugh at it, about her ability or inability to make, you know, rational decisions, how she would act, her mannerisms while she was under the influence of marijuana" and "[Roger] did not try to redirect or assist [Kate] with abstaining from using marijuana." Burger also expressed concern that Roger did not take Kate to the hospital when she was intoxicated on other occasions and did not help her get any substance abuse treatment.

Burger testified that although Roger completed intensive outpatient therapy for his drug issues, he still had a positive hair follicle test result afterwards. According to Burger, "[t]hat only demonstrates the skills that he learned to abstain from using illegal drugs [were] not utilized." Because Roger had not made appropriate lifestyle changes, Burger opined that "if those children were to return to that home, they would not be safe." Burger testified that the children were all doing well in their current placements and were presently stable.

## E. Julia's Testimony

Julia testified that when she and Roger were married, they used methamphetamine together. She further testified that she had never known Roger to be sober. However, Julia stated that she was in recovery and had been sober since 2008. She admitted that there were still problems with Emilio and Jordan, but that overall, the boys were doing better. According to Julia, although the boys were often tardy, they were now regularly attending school.

Julia explained how she addressed some of the problems that had arisen while the

children were in her care. For instance, Emilio had been arrested for stealing a golf cart from a college campus. As a result, Emilio was placed on informal probation. Julia testified that she worked to get Emilio a mentor and thought it was important for him to have someone "to talk to and to help him through everything that he's going through right now." Julia explained that the mentor worked on "coping skills" with Emilio. There was also an incident where Emilio snuck out and fell through the roof of a building. Julia took him to the emergency room afterwards and Emilio had not sustained any serious injuries.

Julia testified that the weekend prior to the final hearing, Emilio was hospitalized for appendicitis. During his admission to the hospital, it was discovered that Emilio tested positive for marijuana. Julia explained that she spoke with Emilio about his positive marijuana result and reported the result to his mentor and probation officer because Julia "felt it was important" for Emilio to take responsibility for his actions.

For her employment, Julia testified that she works at a local shelter with women who have been abused and are experiencing homelessness. As part of her job, Julia provides counseling to these women. Ian, the boys' older brother, was also living with Julia as of the final hearing. According to Julia, Ian "plays football and he's class president." Julia believed Ian was a good role model for his younger brothers. Julia confirmed that it would be best for the children to have both parents in their lives "[i]f [Roger] gets help." Julia also explained that she was not seeking custody of Kate because Kate "is wanting to be on her own."

## F.     Roger's Testimony

Roger testified that he does not have a drug problem. He explained that, in his opinion, the Department believed he had a drug problem because of

> [a]llegations against me. I've had a lot of allegations ruled out. I wasn't at fault. I wasn't around. I passed all my UA tests for them in the beginning and then they decided that they wanted to do a hair follicle test. Why, I don't know. And they're probably thinking about it. I volunteered. My classes and my drug counseling classes. I volunteered everything for them and then Judge Huerta said, well, if you're not using drugs, give me a hair follicle test. No matter what it is, clean or dirty, we need something to start with. That's all we'll use it for. A base point, not nothing to be used against you. It won't be used against you. And I said okay, if that's the case, that's what you want, I'll do that for you all. That's what I did and it backfired on us.

Roger testified that the first time he visited the inpatient treatment facility was on June 1, despite being ordered to begin inpatient treatment on May 11. According to Roger, someone at the inpatient facility informed him that he should come in person and wait in line to see if space opened for him. Roger denied being told by staff at the inpatient facility that he could make an appointment to be admitted. Roger testified that he tried to gain admittance to the inpatient facility center "at least seven to ten times." However, Roger explained that he often believed waiting in line would be futile and that he would leave his place in line after several hours of waiting to attend work instead. The last time Roger attempted to seek admittance to the inpatient facility was either "July the 28th or the 1st of August."

Roger testified that school attendance was an every-day conversation he had with the children, but ultimately blamed the children's excessive absences on Kate having "[a] mind of her own" and Emilio and Jordan being "bored" in school. Concerning Emilio's

positive marijuana test result, Roger testified that, had the child been in his custody, he would have spoken to Emilio about the reasons why he was "doing what he's doing," but would have ultimately left it up to Emilio to decide whether to report his positive drug test to his probation officer.

Roger testified that he was self-employed and made enough in wages to support his children's basic needs. He further testified that he believed he could safely parent the children. Roger also mentioned that the boys called him every night and that he believed that they wanted to return to Corpus Christi to be with him.

## G. Final Order

On December 14, 2021, the trial court signed a final order appointing Julia as permanent managing conservator of Emilio and Jordan and appointing Betty, Kate's fictive kin, as Kate's permanent managing conservator. Roger was appointed as a possessory conservator of all three children, and the trial court found that this was in the children's best interest. The trial court's order also contained a finding that appointment of the parents in this case as joint managing conservators was not in Kate's best interest "because the appointment would significantly impair the child's physical or emotional development."

This appeal followed.

## II. CONSERVATORSHIP

Roger argues that the trial court abused its discretion by not appointing him as a managing conservator of the children "because the trial court was not provided with a

scintilla of evidence upon which it could base the finding that [the children]'s physical or emotional health would be significantly impaired."

## A.    Applicable Law & Standard of Review

When termination of parental rights has been requested, but the trial court refuses such relief, the court shall either "deny the petition" or "render any order in the best interest of the child." TEX. FAM. CODE ANN. § 161.205. The Family Code provides that one or both parents shall be appointed managing conservator "unless the court finds that [the] appointment . . . would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." *Id.* § 153.131(a); *In re F.E.N.*, 579 S.W.3d 74, 76–77 (Tex. 2019) (per curiam).

The fundamental concern underlying § 153.131(a) is the child's ultimate well-being. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "Thus, in order to deprive a parent of custody, the evidence must support a logical inference that some specific, identifiable behavior or conduct of the parent will probably cause significant physical or emotional harm to the child." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied); *see Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). "Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.).

A finding of significant impairment is not necessary if conservatorship rights are

shared solely between parents and the person appointed as managing conservator is a parent. *See* TEX. FAM. CODE ANN. § 153.131(a). In that case, there is a rebuttable presumption that the appointment of both parents as joint managing conservators is in the best interest of the children. *Id.* § 153.131(b). However, that presumption disappears if the evidence shows that appointing the parents as joint managing conservators is not in the best interest of the children. *See Turrubiartes v. Olvera*, 539 S.W.3d 524, 528 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). A finding that appointing the child's parents as joint managing conservators is not in the best interest of the children need only be supported by a preponderance of the evidence. *See* TEX. FAM. CODE ANN. § 105.005.

"Trial courts have wide discretion with respect to conservatorship, control, possession, and visitation matters involving the child." *Compton v. Pfannenstiel*, 428 S.W.3d 881, 886 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (first citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); then citing *In re J.A.J.*, 243 S.W.3d at 616). We review a trial court's determination of conservatorship for an abuse of discretion, and we reverse the trial court's order only if we determine, from reviewing the record as a whole, that the trial court's decision was arbitrary and unreasonable. *Id.* A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Id.* "In family law cases[,] the abuse-of-discretion standard of review overlaps with the traditional sufficiency-of-the-evidence standards of review." *Roberts v. Roberts*, 531 S.W.3d 224, 231 (Tex. App.—San Antonio 2017, pet. denied); *see Bradshaw v. Bradshaw*, 555 S.W.3d 539, 549 (Tex. 2018) (Devine, J., concurring). Therefore, in our review of the trial court's

12

appointment of Roger as possessory conservator rather than managing conservator, we engage in a two-pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion; and (2) did the trial court err in its application of that discretion? *Roberts*, 555 S.W.3d at 549 (citing *Monroe v. Monroe*, 358 S.W.3d 711, 719 (Tex. App.—San Antonio 2011, pet. denied)).

Unlike a finding supporting the termination of parental rights, which requires clear and convincing evidence, a finding that appointment of a parent as managing conservator would significantly impair a child's physical health or emotional development need only be supported by a preponderance of the evidence. *In re D.L.W.W.*, 617 S.W.3d 64, 94 (Tex. App.—Houston [1st Dist.] 2020, no pet.). In determining whether there is legally sufficient evidence to support the trial court's exercise of discretion, a reviewing court considers evidence and inferences favorable to the finding if a reasonable factfinder could and disregards evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *In re H.C.*, 942 S.W.2d 661, 664 (Tex. App.—San Antonio 1997, no writ). In analyzing a challenge to the factual sufficiency of the evidence, an appellate court examines the entire record to determine if the trial court's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 752–53 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."

13

TEX. FAM. CODE ANN. § 153.002. In assessing the best interest of the child, we may consider the following non-exhaustive factors:

(1) the desires of the children;

(2) the emotional and physical needs of the children now and in the future;

(3) the emotional and physical danger to the children now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the children;

(6) the plans for the children by the parents;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

However, there is no requirement that the trial court hear evidence concerning each of the *Holley* factors, and the trial court is permitted to go beyond these factors in determining what is in a child's best interest. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (citing *Holley*, 544 S.W.2d at 371–72); *see also In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098 at *11 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). In cases brought by the Department, there is also a presumption that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307.

Because Emilio and Jordan were placed with Julia, their parent, the trial court was not required to find that appointing Roger as managing conservator would result in significant impairment to their physical health and emotional development. *See id.* § 153.131(a); *Turrubiartes*, 539 S.W.3d at 528. Rather, the evidence needed to only show that appointing the parents as joint managing conservators was not in the best interest of Emilio and Jordan. *See Turrubiartes*, 539 S.W.3d at 528. However, evidence concerning a risk of significant impairment to the children's physical health or emotional development is also probative of their best interest. *See* TEX. FAM. CODE ANN. §§ 153.131(a), 153.134(a)(1–7); *Holley*, 544 S.W.3d at 371–72. Therefore, we address these issues together.

**B.    Analysis**

As to the first *Holley* factor, a child's love for his parent is an important consideration in determining what is in his best interest. *In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). However, evidence of that love cannot override or outweigh evidence of danger to the child. *Id.* Here, Reyes testified that all three children wished to be returned to Roger's care. The attorney ad litem also reported to the court that the children wanted to return to Roger, but that she had concerns about the children's abilities to protect themselves from further harm. The trial court could have concluded that the children's primary motivation in wishing to return to Roger was his lack of supervision. Regardless, this factor nonetheless weighs in favor of appointing Roger as managing conservator of Emilio and Jordan.

Julia testified that she was not seeking to have Kate placed with her because Kate was "wanting to be on her own." The record indicates that, after Roger's positive hair follicle test in April, the trial court gave Kate a choice to either accompany her brothers to Indiana and stay with her mother or remain in Texas with a fictive kin placement. Kate chose to stay in Texas with her friend's mother. However, the record also indicates that Kate, like her brothers, wished to return to her father's care. Therefore, this factor weighs slightly in favor of appointing Roger as managing conservator of Kate.

As to the second and third factors, the evidence shows that the children's emotional and physical needs were multitudinous. According to the affidavit in support of removal, Kate reported to the Department that she and her siblings were "left alone a lot," and that they frequently missed school. The testimony indicated that Kate was strong-willed, and Roger admitted that he had a hard time directing Kate's behavior. However, the record also indicates that Kate was better adjusted when she was with a fictive kin placement. During that time, Kate "follow[ed] all household rules, attend[ed] school through virtual learning . . . and stay[ed] out of trouble with law enforcement." Reyes testified that Jordan and Emilio's needs were currently being met by Julia, and Burger testified that the children were all doing well and were stable in their current placements. These factors therefore weigh against appointing Roger as managing conservator.

As to the fourth factor, the juxtaposition of Julia's and Roger's reactions to their children's behavior demonstrates their overall abilities in this case. Roger laughed at his daughter's drug use and would have left it up to Emilio to report his probation violation.

16

Julia testified that she reported Emilio's drug use to his probation officer because she "felt it was important" for him to take responsibility for his actions. Roger did not take Kate to the hospital when she had previously presented as severely intoxicated. Julia took Emilio to the emergency room after he fell through a roof and when he had appendicitis. Roger admitted he struggled with parenting his children and reported that this led him to lash out physically and verbally at his children. Reyes testified that Julia was also having some difficulties but was seeking out additional resources in order to address these issues. Roger's behavior demonstrates an inability to respond appropriately to stressors, while Julia's behavior demonstrates a well-reasoned response. *See In re R.W.*, 627 S.W.3d 501, 517 (Tex. App.—Texarkana 2021, no pet.) (analyzing mother's inability to handle "daily stressors" as evidence of her parenting abilities). This factor therefore weighs against appointing Roger as managing conservator.

As to the eighth *Holley* factor and the evidence supporting the trial court's significant impairment finding, in *Lewelling v. Lewelling*, the supreme court held that the Department must identify a specific act or omission committed by the parent that demonstrates that appointing him as managing conservator will significantly impair the child's physical health or emotional well-being. 796 S.W.22d at 167–68. "The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child." TEX. FAM. CODE ANN. § 153.004(a). It is a rebuttable presumption that the appointment of a parent as sole managing conservator

17

or as the conservator with the right to establish the primary residence of the child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present child neglect or abuse by that parent directed against a child. *Id.* § 153.004(b). Additionally, "[i]nappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Evidence that a parent engaged in endangering behavior towards one child is relevant to a determination of whether the parent endangered other children. *See In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *see also In re A.E.J.*, No. 05-20-00340-CV, 2020 WL 5107293, at *7 (Tex. App.—Dallas Aug. 31, 2020, pet. denied) (mem. op.).

The record indicates that on July 24, 2018, Jordan "fell and hit his head on the bunk bed and approximately 20 minutes prior to going to the emergency room he fell and hit his head again on the bottom bunk." Jordan was diagnosed with a hematoma. On September 1, 2018, the Department received a report alleging that Roger hit Jordan with a broomstick. On October 27, 2018, the Department received another report alleging "emotional/verbal abuse, physical abuse and neglectful supervision of [Jordan] and [Emilio] by [Roger]." At the time, Jordan was receiving psychiatric care and made an additional outcry concerning Roger's physical abuse. The Department validated Roger for neglectful supervision and physical abuse. Roger also admitted to the Department that

18

his struggles parenting caused him to lash out physically at his children. The trial court was required to consider this evidence in determining whether to appoint Roger as a managing conservator. *See* TEX. FAM. CODE ANN. § 153.004(a).

A reasonable factfinder could also conclude that Roger's failure to redirect Kate's behavior resulted in her neglect. The record shows that Roger was aware of Kate's drug use and would "laugh at it," thereby acquiescing to her drug use and doing nothing to prevent it or seek help for it. It is apparent from the record that Kate's drug use was not mere experimentation, but a significant issue in her life. She was hospitalized, ordered to attend juvenile drug court, regularly drug tested by the trial court, arrested for allegedly smoking synthetic marijuana, reportedly hiding "stashes of marijuana" in her bedroom, and, perhaps most significantly, held up at gunpoint when trying to purchase marijuana. The Department identified in its service plan that Kate "has a history of drug use and alcohol consumption. [Kate] was previously referred to substance abuse counseling, but [she] did not participate/attend." Burger testified that Kate's behavior was a product of Roger's own drug use in the home and his failure to seek help for his daughter.

The record indicates that, at best, Roger minimized Kate's substance abuse. Regarding the incident where Kate was brought home by police in an intoxicated state and then later brought to the hospital, Roger testified that Kate "was fine. She was walking straight[;] she was talking clearly. She wasn't under the influence of anything." However, the record indicates that Kate had four different substances in her system and her blood pressure was "very low." At the time, Kate was only fourteen years old. Roger admitted

19

to the Department that Kate had come home in a similar state before and he had not sought medical attention for her then. The trial court could have concluded that Roger's failure to seek medical care for Kate in the past presented an immediate danger of bodily injury, and therefore, resulted in neglectful supervision. *See id.* § 261.001(4)(A)(ii)(b).

In *May v. May*, we concluded that a trial court "may logically infer that serious violations of the law by the parent, such as the use and sale of drugs, especially when committed in the same home in which the children reside, would set an unacceptable standard for the children to follow and significantly impair their emotional development." 829 S.W.2d at 377–78. The record shows that Roger's children were aware of his drug use. Jordan reported to the Department that he had seen syringes in beer bottles and had witnessed his father "sniffing" a substance. Burger testified that the children started skipping school in September 2020 while placed with a fictive kin caregiver after they learned that Roger's drug tests were positive. Instead of attending school, they would visit Roger's home. The trial court may have concluded that Roger's visible drug use set a detrimental example for his children and was indicative of an improper parent-child relationship.

Although Roger testified that he was able to safely parent the children, he had a history of not providing competent care for them. The children had extensive unexplained school absences while in his care. Less than five months before the final hearing, Roger admitted to the Department that he was putting meth in his coffee but denied having a drug problem. The trial court is permitted to infer that "an adult person's future conduct

20

may well be measured by his recent deliberate past conduct as it may be related to the same or a similar situation." *Id.* at 377. Therefore, there are several "acts or omissions" on the part of Roger that indicate this factor weighs heavily against appointing him as managing conservator.

As to the last factor, Roger testified that he attempted to seek inpatient treatment, but was not successful in gaining admission to the facility. Reyes testified that he checked on Roger several times throughout the month of June but received no response. Tijerina testified that there were beds available during the period of time Roger was supposed to complete treatment. Burger opined that she believed Roger's continued drug use after engaging in some substance abuse counseling and his failure to complete inpatient treatment reflected a "motivation issue." Roger swore that he did not have a drug problem. However, the trial court enjoys the right to resolve credibility issues and conflicts within the evidence as it sees fit, and it was entitled to believe the Department's version of events over Roger's. *See In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) (citing *In re E.S.M.*, 550 S.W.2d 749, 757 (Tex. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.)). Therefore, this factor weighs in favor of the trial court's judgment.

The evidence of Roger's acts and omissions, coupled with the testimony that the children were all doing well and were stable in their current environments, demonstrates that some evidence supported the trial court's finding that Roger's appointment as managing conservator would significantly impair Kate's physical health or emotional development. *See Danet v. Bhan*, 436 S.W.3d 793, 798 (Tex. 2014) (holding "evidence

21

of misconduct in the more distant past, evidence of more recent misconduct, and evidence of the stability of the child's current placement" constitutes "some evidence" to support substantial impairment finding). The trial court's finding is also not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See In re C.H.*, 89 S.W.3d at 25. Therefore, refusing to appoint Roger as managing conservator of Kate was not an abuse of discretion. *See In re Rodriguez*, 940 S.W.2d 265, 273–74 (Tex. App.—San Antonio 1997, writ denied).

Additionally, the trial court's order appointing Julia as managing conservator and Roger as possessory conservator of Emilio and Jordan is supported by the evidence and was guided by the best interests of the children. Based on the foregoing, we cannot conclude the trial court abused its discretion by refusing to appoint Roger as managing conservator of his three children. As such, we overrule the issues Roger raises on appeal.

### III. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
12th day of May, 2022.

22